**BROWNING–FERRIS INDUSTRIES, INC. and Jim Meszaros, Appellants,**

v.

**Tony ZAVALETA, Appellee.**

**No. 13–90–215–CV.**

Court of Appeals of Texas, Corpus Christi.

Oct. 10, 1991.

On Motion for Rehearing Feb. 13, 1992.

Rehearing Overruled March 5, 1992.

By points of error one, two, and three, appellant complains that there is either no evidence, no positive, clear and satisfactory evidence, or insufficient evidence to support the jury's findings in special question number one that Meszaros, acting without probable cause and with malice, caused, aided or cooperated in causing a criminal prosecution of Zavaleta. Issues four, five, six, seven, eight, and nine deal with the trial court's failure to instruct concerning the relationship of full and fair disclosure to probable cause and the evidence relating to probable cause. Because these points are interrelated and dispositive of the case, we will discuss them together.

Malicious prosecution actions, because of their inherent characteristics, have never been favored in law. *Sebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 694 (1894); [1] *Diamond Shamrock Corp. v. Ortiz,* 753 S.W.2d 238, 241 (Tex.App.—Corpus Christi 1988, writ denied).

Lisa D. Powell, Gary L. Gurwitz, Charles C. Murray, Atlas & Hall, McAllen, Professor William Powers, The University of Texas, School of Law, Austin, Roger Townsend, Fulbright & Jaworski, Houston, for appellants.

Jeffrey D. Roerig, Black, Hamilton, Roerig & Yanez, Brownsville, Neil Norquest, Keith C. Livesay, Law Office of Neil Norquest, McAllen, for appellee.

## OPINION

SEERDEN, Justice.

This is an appeal from a judgment based upon a jury verdict finding appellants guilty of malicious prosecution and awarding appellee actual and exemplary damages. Appellants bring twenty-eight points of error. We reverse and remand to the trial court.

■ In order to maintain a malicious prosecution action, a plaintiff must prove: 1) the commencement of a criminal prosecution against the plaintiff; 2) which has been caused by the defendant or through the defendant's aid or cooperation; 3) which terminated in the plaintiff's favor; 4) that the plaintiff was innocent; 5) that there was no probable cause for the proceedings; 6) that it was done with malice; and 7) that it damaged the plaintiff. *Euresti v. Valdez,* 769 S.W.2d 575, 578 (Tex. App.—Corpus Christi 1989, no writ); *Ellis v. Sinton Savs. Ass'n,* 455 S.W.2d 834, 836 (Tex.Civ.App.—Corpus Christi 1970, writ ref'd n.r.e.). The gravamen of a malicious prosecution action is improperly making a party the subject of legal process to his detriment. *Martin v. Trevino,* 578 S.W.2d 763, 766 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Daniels v. Conrad,* 331 S.W.2d 411, 415 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.).

---

**1.** In *Sebastian,* Justice Brown points out that "It is important that every citizen should be protected against malicious prosecutions, and it is equally important that crimes should be punished, in order that the law-abiding citizen may be secure in life, liberty, and property. To make the citizen liable to be mulcted in damages for an honest discharge of duty is to give immunity to crime, and to weaken the restraining power of the criminal law, thereby endangering the security of law-abiding people ..." *Sebastian,* 25 S.W. at 694.

The undisputed evidence in this case shows that on January 30, 1987, appellee was indicted by the Cameron County grand jury. The indictment charged that Zavaleta, who was an elected member of the Brownsville City Commission, had unlawfully solicited Browning–Ferris Industries (B.F.I.) and their manager, James Meszaros, to deposit money in the International Bank of Commerce (I.B.C.) to confer a benefit on Hector Silva, an officer of I.B.C. and a person in whose welfare Zavaleta was interested. The offense charged is a class A misdemeanor under Tex.Penal Code Ann. § 36.08(e) and (g).

After being indicted, appellee was arrested, booked, arraigned and released on bond. The indictment was subsequently dismissed pursuant to a motion filed by a special prosecutor appointed to handle the case. The motion requested that the case be dismissed because the evidence was insufficient. The motion contains the following handwritten statement of the Special Prosecutor:

"After interviewing all the witnesses in the above styled and numbered cause, Counsel for the State is of the opinion that the evidence would be insufficient to prove beyond a reasonable doubt the allegations in the indictment and that the interest of justice would best be served by dismissing this prosecution."

After the criminal case was dismissed, this suit for malicious prosecution was instituted by appellee, Dr. Tony Zavaleta.

The remainder of our discussion of the evidence will be done within the context of appellants' first three points of error. In considering "no evidence," "insufficient evidence" or "against the great weight and preponderance of the evidence" points of error, we follow the well-established tests set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1989); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 458 (Tex.1985); *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Allied Fin. Co. v. Garza*, 626 S.W.2d 120, 125 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, *No Evidence and In-sufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960).

Question one, which the jury answered affirmatively, included definitions of both probable cause and malice. "Probable cause" was defined as "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the actor, that the person charged was guilty of the conduct for which he was prosecuted." "Malice" was defined as "intentional wrongful acts done willfully and purposely with ill will or evil motive to the injury of another or done in reckless disregard of the rights of another and indifferent as to whether the other person is injured or not as to amount to wanton and willful action knowingly and unreasonably done." The appropriateness of the definition of probable cause will be discussed under points four through nine.

■ In discussing point one, the no evidence point, we consider only the evidence and inferences tending to support the finding of the trier of facts and disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of America*, 774 S.W.2d 666, 668 (Tex.1989).

■ In this context, there was evidence that at all material times, appellee was an instructor at Texas Southmost College and an elected member of the Brownsville City Commission. In 1984, the Commission, in large measure through the efforts of Zavaleta, began exploring and negotiating proposals to "privatize" the commercial garbage and refuse collection service of the city. Among the companies that proved interested in bidding on the service was appellant, Browning–Ferris Industries (B.F.I.). During the contract negotiating process, B.F.I. was represented primarily by appellant James Meszaros; however, there were other B.F.I. officials and employees engaged in the process. Dr. Zavaleta testified that the B.F.I. people would stop by his office, invite him to lunch, had offered him a hunting trip and told him he would not "have any financial worries during any subsequent election campaigns" if

**340**

he supported their proposal in the waste collection contract vote. The evidence indicated that B.F.I. was the company likely to get the contract.

The events giving rise to the criminal indictment occurred on September 10, 1985, shortly before a meeting of the City Commission at which, in addition to other matters, the waste collection contract was to be discussed. Meszaros and two other B.F.I. employees, Alec Young and Juan Gonzales, were standing outside the Commission chambers. Standing nearby was Fred Rusteberg, President of the International Bank of Commerce and Hector Silva, the bank's Executive Vice–President. Dr. Zavaleta came up and introduced the two groups to each other. The substance of this introduction and the ensuing conversation formed the basis of the indictment and this lawsuit.

At a later meeting, the City Commission instructed the city manager to negotiate a final contract with B.F.I.; however, Bob Torres, a representative of a new company, GMS, who had not previously been involved in any of the negotiations, appeared at the meeting, stated it was locally owned, could save the City some money and requested that the commission re-open the negotiations. Instead of awarding the contract to B.F.I., the commission voted to re-open the process. Zavaleta concurred in the vote to re-open, which he testified would "cost (B.F.I.) several millions dollars." He further testified that after this vote, Meszaros made eye contact with him and shook and wagged his finger at him. On May 6, 1986, Dr. Zavaleta and the City Commission accepted the GMS proposal.

The evidence further shows that the Brownsville City Commission, at some time prior to the indictment of appellee, requested the Texas Rangers and other law enforcement agencies to institute an independent investigation of the city's operations. This request was completely independent of the negotiations for the contract to collect refuse and was prompted by television and newspaper accounts alleging improper activities within the government of the city of Brownsville.

The Rangers, in conjunction with the Cameron County District and County attorney's office, conducted what apparently was a broad investigation of city offices and officials. Because of his friendship and association with many of those being investigated, and to avoid the appearance of impropriety, the elected District and County attorney removed himself from the investigation and turned supervision of same over to his chief assistant, Mervin M. Mosbacker, Jr. The primary enforcement officers connected with the investigation were the District Attorney's investigator Joe V. Garza and Texas Ranger Rudy Rodriguez.

In December 1986, James R. Meszaros, the B.F.I. employee who directed the bid for the Brownsville waste disposal contract, became aware of the Texas Rangers' investigation. Dan North, a former Texas Ranger and head of B.F.I. security, contacted Ranger Rodriguez. Rodriguez and Detective Garza went to Houston and obtained a written statement from Meszaros. This statement, given December 17, 1986, relates that the meeting in which Torres announced the formation and interest of GMS was at City Hall at a time when "we (B.F.I.) were getting ready to close the negotiations with the city and getting the contract approved." It further related that "This intervention by Bob Torres stopped everything and our company did not receive the contract."

The next event in the chain leading to this suit was a letter dated January 19, 1987, from Meszaros to Mr. Mosbacker, the prosecutor in charge of the Ranger investigation. This letter purports to enclose various proposals made by B.F.I. at the request of Brownsville officials and summarizes some of the dealings between the city and B.F.I. Zavaleta is mentioned on one occasion, when the letter states

"At a Council meeting in the Police Station, I don't recall the date, Council was to award the contract. In fact, Commissioner Tony Zavaleta introduced me to two gentlemen from a bank in Brownsville that had just opened, stating that we, BFI, was going to have the garbage

contract in Brownsville. This bank was a branch of a bank in Laredo, Texas. Mr. Zavaleta asked if we could put our Brownsville account with this bank, of which I said I thought it would not be a problem, but I would have to check with the people who make those decisions."

On January 30, 1987, Meszaros and Alec Young, another B.F.I. employee, met with Investigator Garza and Mr. Mosbacker, at the prosecutor's request and pursuant to subpoenas from the grand jury, and gave additional written statements to Garza. These statements also included their version of the conversation between themselves, Zavaleta and the bankers, now identified as Fred Rusteberg and Hector Silva, president and vice-president, respectively, of International Bank of Commerce (I.B.C.).

Dr. Zavaleta, Fred Rusteberg, and Hector Silva all testified that Zavaleta never solicited the bank account from B.F.I. or Meszaros to I.B.C. The substance of their version of the meeting between the parties was simply that all these gentlemen were in the hall prior to the commission meeting and that Zavaleta introduced the B.F.I. officials to the bankers and suggested they should become acquainted.

The grand jury indicted Zavaleta the same day the case was presented to them, January 30, 1987. Zavaleta was arrested, photographed and fingerprinted. The news media gave extensive publicity to his indictment and arrest.

Thereafter, the district attorney, again to insure no "appearance of impropriety," removed his entire staff from the case and Sharon MacRae, a former Bexar County prosecutor practicing law in San Antonio, was appointed Special Prosecutor. After reviewing the evidence, Ms. MacRae on April 22, 1987, filed a motion to dismiss the indictment for the reason that "Counsel for the State is of the opinion that the evidence would be insufficient to prove beyond a reasonable doubt the allegations in the indictment and that the interest of justice would best be served by dismissing the prosecution." The judge granted this motion the same day it was filed.

Evidence was also offered showing the injuries and damages to appellee as a result of his prosecution. Because of our disposition, it is not necessary to detail this evidence; however, in general his evidence showed him to be a respected member of his community with a reputation for honest and dedicated community service who was subjected to public embarrassment, shame and criticism by the indictment, arrest, booking and publicity attendant thereto.

It is appellee's theory of the case that the statements of Meszaros and Young were false, that they knew they were false, and that when they were made it was with the intention of getting Zavaleta prosecuted. They contend that the wagging of the finger and making eye contact with Zavaleta at the Commission meeting where the contract negotiations were re-opened is evidence of malice and that these B.F.I. employees were "out to get" Zavaleta.

Viewing the evidence recited above in the light most favorable to appellee, we find it to be some evidence to support appellee's theory and contention. Point of error number one is overruled.

By point of error two, appellants contend the jury's answer to question one was not supported by positive, clear and satisfactory evidence.

■ Because of the nature of malicious prosecution cases and the public policy need for citizens to feel free to furnish information relating to possible illegal activities to law enforcement authorities, and because of the general policy of free speech and free exchange of ideas, it has been held that in malicious prosecution cases, the proof must be positive, clear and satisfactory. *Diamond Shamrock*, 753 S.W.2d at 241. However, it is settled that courts of appeals have only two standards by which evidence may be reviewed: factual sufficiency and legal sufficiency. *Meadows v. Green*, 524 S.W.2d 509 (Tex.1975). A court of appeals cannot apply a third standard of reviewing the evidence, the "clear and convincing" standard. *Id.* The court's charge in this case required the jury to base its answers on "a preponder-

ance of the evidence," which term was properly defined by the court. There was no objection to this instruction. Had the trier of facts been instructed to base its answers on a "clear and convincing" standard, we could review the legal and factual sufficiency in light of that standard. *See Williams v. Texas Dept. of Human Servs.*, 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ); *In re J.J.M.*, 763 S.W.2d 64, 66 (Tex.App.—Fort Worth 1989, no writ). Since there was no objection to the court's charge to the jury on the burden of proof, we hold appellants have waived the matters complained of in point of error number two.

■ We now consider point of error three—the factual sufficiency of the evidence. In reviewing an insufficiency of the evidence challenge, we must first consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *Plas-Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). Having done so, we will set aside the verdict only if the evidence standing alone is too weak to support the finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust or clearly wrong.

*Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

■ We have previously discussed the evidence favorable to the jury verdict. Other evidence shows that the district attorney procured the indictment of Zavaleta independently and not at the instigation of B.F.I. or its employees. While appellant initiated the original contact between appellant and the investigators, it is undisputed that no mention of the events giving rise to the indictment or this suit were made at that meeting. In fact, Zavaleta's name was not even mentioned at that meeting. B.F.I.'s employees testified that their primary purpose in contacting the Rangers was to determine if they were involved in any way in the investigation. It was not until Meszaros was contacted by the District Attorney or his investigator that the subject of the meeting and conversation made the basis of this suit was mentioned. Zavaleta's own witness, the investigator Garza, as well as the testimony of Meszaros and Young indicate that they were not aware that the matter would result in an indictment. While the letter from Meszaros to the district attorney dated January 19, 1987, mentioned Zavaleta, such reference was not the major focus of the letter.[2]

2. The complete text of the letter is as follows:
January 19, 1987

Mr. Mosbacker
District Attorney's Office
974 E. Harrison Street
Brownsville, Texas 78520
Dear Mr. Mosbacker:
Over the past 5 to 6 years, I have talked to various City officials regarding the privatization of refuse collection in the City of Brownsville. While I have visited with Ken Lieck and Edward Campanaro very frequently, serious negotiations started after the City's request for proposals on May 1, 1985. As you look through the enclosed proposals, and there are many of them, you will find that I responded to the City Manager's requests on numerous occasions for different types of proposals whether it be commercial only, or a combination of commercial, residential and street sweeping services. Our initial proposal was dated May 21, 1985 although the request for proposals indicated a due date of May 16th. Mr. Campanaro extended the date for all bidders.
After the initial proposals were received, various meetings were set to discuss still other alternatives. The initial awarding was delayed because of Commissioners' election.

Prior to the election, we were told that BFI was the best bidder and most responsible bidder. Sometime during the period of May 1, 1985 and October 1985, Mr. Lieck or Mr. Campanaro visited the various facilities of the bidders. When that election was finalized Mr. Lieck asked that we submit new proposals, copies of which are attached. The bidders up to February 1986 were BFI, Commercial waste Disposal and Garbage Cobbler of San Antonio.
Sometime between January 1986 and February 25, 1986, Mr. Bob Torres, at a Council meeting, got up before Council and stated that he represented a group of local investors that had formed a company called Governmental Managerial Services. At this time, he made the proposal that his company would keep rates in service as they are as well as participate in clean-up projects at no cost to the City, advertizing programs promoting the City throughout the State of Texas, place pedestrian sidewalk trash containers throughout the City and many other items. If you were to get a copy of the tape of that Council meeting it would give you exactly what Mr. Torres proposed to the City for services to be provided by GMS.
At a Council meeting in the Police Station, I don't recall at date, Council was to award the

In addition, both District Attorney Euresti and Assistant Mosbacker testified that the decision to seek the indictment was that of Mosbacker alone and that he relied on facts independent of appellant's statements in making the decision. In fact, in his testimony in this case, Mosbacker testified he still believed that Zavaleta should have been prosecuted for the offense for which he was indicted.

Meszaros testified and denied that he had pointed his finger at Zavaleta after the council meeting. While he affirmed that

contract. In fact, Commissioner Tony Zavaleta introduced me to two gentlemen from a bank in Brownsville that had just opened, stating that we, BFI, was going to have the garbage contract in Brownsville. This bank was a branch of a bank in Laredo, Texas. Mr. Zavaleta asked if we could put our Brownsville account with this bank, of which I said I thought it would not be a problem, but I would have to check with the people who make those decisions.

BFI was awarded the contract on February 25, 1986. On February 26, Mr. Richard Freed, our in-house counsel and I met with Mr. Ken Lieck who in turn introduced us to Mr. Kip Hodge, City Attorney and asked us to work out the details of the contract that we had submitted. After Mr. Hodge, Mr. Freed and I worked out the details, we went back to Mr. Lieck's office and told him of the changes, asked if they were satisfactory and he said to make the changes in the contract and send it back to him. At that time, we felt that we had accomplished what Council had asked of Mr. Lieck. In fact, we put our suppliers on notice so we could start immediately upon execution of the contract. This was felt to be important by us as well as City management because of the deteriating condition of the City's equipment.

From that point on, things seemed to change on a weekly basis. Mr. Torres was visiting with Mr. Lieck, some members of Council as well as the Mayor in making different proposals. Mr. Lieck still assured me that there was no way the City would do business with Mr. Torres. In fact he stated that if this Council and Mayor would award to GMS, "I will quit my job." On March 18, the Commission rescinded its authorization to the City Manager to negotiate the contract although it was already done with BFI, and in turn, gave authority to negotiate with GMS.

The swing vote in this situation was Ms. Susan Austin. Ms. Austin, I felt up to this point was bordering on whether to privatize or not, so I had one of our sideloader containers delivered to her office and showed her the type of equipment we proposed to use. We, in fact after showing her, took a ride to a school and she asked me how that type of container would work at that location. When I left her, she indicated that I had put her mind at ease as to the type of equipment, we were going to use. I understand that within a short period, a week or two, that Ms. Austin was flown to Laredo by private plane to visit with Mr. Trevino. The gentlemen taking her was an attorney that represented GMS.

I would like to say further that the proposals that we had submitted in many cases were asked for on very short deadlines of which we always met the deadline when by sending the proposals by Federal Express or by flying them down personally.

In every case where GMS was asked to submit a proposal when we were, theirs were never submitted on time. This was told to me by Mr. Lieck. In fact on some occasions, they would come a week or so late. GMS's proposals generally were patterned after what BFI submitted. On October 8, 1985, Al Young, the general manager of our Rio Grande district, called me at my Houston office to tell me that Mayor Hernandez had requested a cash contribution to Mr. Jesse Slosse's reelection. I later found out from Al that Mayor Hernandez's actual request was for $3,000.00 for Mr. Slosse's reelection. I told Mr. Young under no circumstances would BFI or any employee of BFI be authorized to make a cash contribution in the amount of $1,000.00. I told Mr. Young that we could not give Mr. Slosse even a $1,000.00 contribution in a Commissioner's race. We generally would donate $200–$300; however, in view of the fact that the Mayor had asked for so much, I felt there must have been a real need. I then told Al that I would ask for a check from Texans for Political Action fund in the amount of $500.00 The check was cut on October 9 and I brought it to Brownsville to be delivered. My purpose in personally delivering the check, with Juan and Al in attendance, was to explain that we do make political contributions but $1,000 was out of the question for this type of election and that we have generally supported incumbents.

When we went to Mr. Slosse's house to deliver the check and he answered the door, I proceeded to tell him what we were there for. He looked shocked and was upset that we were taking him a check that he knew nothing about. We told him Mayor Hernandez had requested the money in his behalf. Our conversations with Mr. Slosse were very short because he closed the door and ended the discussions.

We took the check to Mayor Hernandez's used car lot and told him that we had gone to deliver the check to Mr. Slosse and that he had refused it. I then offered the check to Mayor Hernandez, but he also refused the check and told him that I would take the check back to Houston and hold it for a week in case he changed his mind.

Sincerely,

s/_____

James R. Meszaros
Director of Marketing, Southwest Region and Vice President

he understood Zavaleta to be suggesting he put money in I.B.C. bank, there was no evidence that he was aware of any relationship between Zavaleta and the bank, or any of its officers. He testified that the reference to Zavaleta in the letter of January 19, 1987, was only to help fix the time and place of that particular council meeting. He expressed surprise that Zavaleta had been indicted. He told the special prosecutor MacRae that he didn't think Zavaleta had done anything wrong.

Mervin Mosbacker, Jr. was the assistant district attorney who procured the indictment of Zavaleta. He testified that in his opinion he had probable cause to believe that a crime had been committed based upon the evidence in the case. It is observed that there were six people present when the conduct that is the subject of the indictment occurred. Meszaros specifically recalled that Zavaleta made a district solicitation for the B.F.I. bank account for the bank represented by Mr. Silva and Rusteberg. Young's recollection was the same. Gonzales, the other B.F.I. employee did not specifically recall the substance of the conversation. Prior to the indictment, the other participants had also talked to the representatives of the state. Zavaleta, Silva, and Rusteberg all denied that Zavaleta had specifically solicited B.F.I.'s bank account. They stated that Zavaleta introduced the B.F.I. people to the bankers, stated that B.F.I. was to get the contract and that the two groups should get to know one another. In his testimony, District Attorney Mosbacker repeatedly stated that he was not interested in Meszaros' impression of Zavaleta's intention but only the evidence presented. He remained firm in his belief that the evidence was sufficient to justify the indictment.

There was also evidence that Zavaleta's girlfriend was related to Mr. Silva. There was no evidence that this information was known to B.F.I. or its representatives, but it was known to the district attorney. This information would be significant in showing an essential element of the indictment—Zavaleta's interest in Silva's welfare.

Special Prosecutor MacRae, relying on the same evidence relied on by Mosbacker, was of the opinion that there was insufficient evidence to justify the prosecution. Ben Euresti, the elected district and county attorney, while conceding that there was room for a legitimate difference of opinion, testified that he concurred with Ms. MacRae's analysis.

The Restatement (Second) of Torts § 653, comment (a) 1977, quoted favorably in *Thomas v. Cisneros*, 596 S.W.2d 313, 317 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) states:

> In order to charge a private person with responsibilities for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or the information furnished by him upon which the official acted was known to be false.

Even under the definition of "probable cause" submitted to the jury in connection with Question one, we believe the evidence is insufficient to show that B.F.I. and Meszaros desired to have Zavaleta indicted in this instance and that the answer of the jury was so against the great weight and preponderance of the evidence as to be incorrect. Whatever direction or pressure they may have exerted on the prosecutor's staff, the evidence does not support the conclusion that it was a determining factor in the decision to bring the indictment.

However, we need not base our ultimate decision in this case solely on the insufficiency of the evidence. Appellants' points of error four, five, six, seven, eight, and nine complain about the definition of "probable cause" contained in jury Question one and the failure of the trial court to instruct the jury concerning "full and fair disclosure" on the part of appellant.

The definition of "probable cause" submitted by the trial court is essentially the same as that used in *Akin v. Dahl*, 661 S.W.2d 917 (Tex.1983), and *Ram-*

*sey v. Arrott,* 64 Tex. 320 (1885).[3] Appellant suggests that this case is distinguishable from the *Akin* line of cases, because in those cases the party being sued actually brought the formal complaint, where, in this case, appellants did not formally bring a criminal complaint, but furnished information to the law enforcement officers, who acted independently and used their own discretion in bringing formal charges. They further argue that in this situation, the standard of probable cause is and should be different. They contend that when one actually brings the criminal charge, the test of "belief in a reasonable mind, acting on facts within his knowledge, that the person is guilty of the criminal conduct for which he is charged is appropriate;" however, appellants contend that this case is governed by the principles set out in *Thomas,* 596 S.W.2d at 316. *Thomas* was a summary judgment case in which Cisneros was an employee of the State Board of Insurance and coincidentally, was a member of the Travis County Grand Jury. A fellow employee, Thomas, remarked in a conversation concerning Cisneros' service on the grand jury, "well, I hope you are not after the chairman, you might not be here the next day." It was obvious that this remark referred to an investigation of a particular insurance company and its regulation by the Board of Insurance. Cisneros reported the conversation to the grand jury foreman. Later, the District Attorney questioned Cisneros about the incident. Cisneros refused to sign a complaint; however, the District Attorney signed a complaint charging Thomas with the crime of "retaliation." The charges were subsequently dismissed. Thomas sued Cisneros for malicious prosecution.

In affirming the summary judgment in favor of Cisneros, the court stated:

"Because we deem the element of causation to be determinative of this case, we will discuss only this issue. This element of malicious prosecution can be caused by the defendant *or through the defendant's aid or cooperation* [citations omitted]. It is not necessary for the defendant to have signed the complaint or to have communicated the subject matter to the person who did if the making of the statement proximately caused the prosecution that followed [citations omitted]. However, it is a corollary to this rule ... *if the defendant stated the facts fully and fairly to the District Attorney ... and such officer determines that such facts constitutes a crime and proceeds to formulate the necessary papers to set the prosecution in motion, the ... defendant is not liable in an action for malicious prosecution, since, if there is any fault, it is not the defendants."* (emphasis added).

We conclude that when the person charged with malicious prosecution directly brings the formal criminal complaint, a definition of "probable cause" such as given in this case would be proper. *See Akin v. Dahl,* 661 S.W.2d 917 (Tex.1983).

■ However, if the indictment is caused indirectly through the aid or cooperation of the person charged with malicious prosecution, such person is not liable if he has made a full and fair disclosure of the facts to the prosecuting authorities. *Thomas,* 596 S.W.2d at 317.

In discussing probable cause, this court observed in *Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied):

"A prosecuting party who files a criminal complaint does so upon probable cause where, in good faith, he makes a full and fair disclosure of the facts and circumstances known to him at the time. *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 627 (Tex.App.—Houston [1st Dist] 1984, writ ref'd, n.r.e.). Unless a person

---

3. "Probable cause" means the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the actor, that the person charged was guilty of the conduct for which he was prosecuted.

"Malice" means intentional wrongful acts done wilfully and purposely with ill will or evil motive to the injury of another or done in reckless disregard of the rights of another and indifferent as to whether the other person is injured or not as to amount to wanton and wilful action knowingly and unreasonably done.

fairly discloses information to a prosecuting attorney, in good faith, probable cause does not exist. id. Probable cause has been defined as a state of mind in which the facts are regarded from the point of view of the prosecuting party, id. The question is not what the actual facts were, but what he honestly believed them to be, id."

■■■ The definition of probable cause submitted by the court in this case required the jury to focus on whether Meszaros *reasonably* believed that Zavaleta made the statements for which he was prosecuted, whereas a proper inquiry would focus on whether he *actually* believed that Zavaleta made the statements, regardless of whether they were actually made.

■■■ In addition, the court's instruction fails to address the principle of full and fair disclosure. Zavaleta had the burden of proving that the appellants failed to make a full and fair disclosure of the facts and circumstances known to them. *Coniglio*, 756 S.W.2d at 747; *Terk v. Deaton*, 555 S.W.2d 154, 155 (Tex.Civ.App.—El Paso 1977, no writ). We cannot agree with appellee that the definition of probable cause submitted in this case includes the elements of full and fair disclosure. As mentioned previously, the explanation of probable cause submitted inquires as to whether the facts and circumstances would excite the belief in a *reasonable* mind, that the person charged was guilty of the conduct for which he was charged, whereas, the requirement in this situation should only constitute probable cause if the facts and circumstances excited the belief in the *person reciting* them, so long as a full and fair disclosure was made. Appellant requested the court in instruct the jury,

"A person who makes a full and fair disclosure to a law enforcement officer of information that he believes to be true is not the cause of the prosecutions and is not considered to have aided and cooperated in causing that prosecution, even if the information is false and a reasonable person would not believe it."

In addition, appellants' objection to question number one that the jury was not informed that, where the prosecuting officer in this situation initiates criminal proceedings, a person who makes a full and fair disclosure of facts is not guilty of malicious prosecution, had previously been overruled.

In light of the facts before the jury, the objections to the charge made by appellants and the request for the additional instruction, we hold that the definition of probable cause was insufficient and therefore erroneous and that such error was reasonable calculated to cause the rendition of an improper judgment within the meaning of Tex.R.App.P. 81. Appellants' points of error three and four through nine are sustained.

Because of our rulings on the points of error discussed, it is unnecessary for us to consider appellants' remaining points.

The judgment of the trial court is reversed and the case is remanded for a new trial.

NYE, Chief Justice, dissenting.

I dissent from the majority's opinion. The majority reversed this case on the basis that the "evidence is insufficient to show that B.F.I. and Meszaros desired to have Zavaleta indicted in this instance and that the answer of the jury was so against the great weight and preponderance of the evidence as to be incorrect." In arriving at this conclusion, the majority has not followed the guidelines set down by our Supreme Court which are to be used when reversing a case based upon insufficient evidence.

The procedure which an appellate court must follow when analyzing a factual insufficiency claim was stated in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). The Supreme Court, trial courts, and appellate-law scholars cannot determine whether the requirements of *In re King's Estate* have been followed unless the proper analysis is reflected in the appellate court's opinion. This analysis was explained in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986). In *Pool*, the Supreme Court stated that courts of appeals:

[S]hould, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, those courts, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. . . .

*Pool*, 715 S.W.2d at 635. The majority has not follow the *Pool* standard.

The jury in this case found that Jim Meszaros, acting without probable cause and with malice, caused, or aided or cooperated in causing, a criminal prosecution to be commenced against Dr. Tony Zavaleta. The causation element of malicious prosecution requires that the criminal prosecution be caused by the defendant or through the defendant's aid or cooperation. *Thomas v. Cisneros*, 596 S.W.2d 313, 316 (Tex. Civ.App.—Austin 1980, writ ref'd n.r.e.). It is not necessary for the defendant to have signed the complaint or to have communicated the subject matter to the individual who did *if the making of the statement proximately caused the prosecution that followed.* *Thomas*, 596 S.W.2d at 317. *Restatement (Second) of Torts*, § 653, Comment g (1977) states, in relevant part:

If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Meszaros' sworn statement to the district attorney's office indicated that after Dr. Zavaleta introduced him to Fred Rusteberg and Hector Silva, Dr. Zavaleta told Rusteberg and Silva that BFI "was going to have the garbage contract," and he asked Meszaros if BFI "could put" its Brownsville account with the International Bank of Commerce ("IBC") located in Brownsville. Rusteberg was IBC's President and Silva was IBC's Executive Vice–President. According to the Hon. Benjamin Euresti, the Cameron County District Attorney, information was presented to the grand jury that Dr. Zavaleta's girlfriend was related to Silva. At the time Meszaros allegedly heard Dr. Zavaleta make this statement, Dr. Zavaleta, Juan Gonzalez (a BFI employee), Meszaros, Al Young (a BFI employee), Fred Rusteberg and Hector Silva were standing outside the Brownsville city commission chambers. Three of these individuals, Rusteberg, Silva and Gonzalez, testified that Dr. Zavaleta did not make these statements. If the jury chose to believe Rusteberg, Silva, and Gonzalez, in addition to Dr. Zavaleta's own sworn testimony that he did not make this statement, then Meszaros' sworn statement was false, and the jury could determine that Meszaros knew it was false when he gave his sworn statement to the district attorney's office. On the basis of this false statement, the district attorney's office chose to seek an indictment against Dr. Zavaleta.

A party filing or causing the filing of a proper criminal complaint does so with probable cause when, in good faith, he makes a full and fair disclosure of the facts and circumstances known to him at the time and the complaint is thereafter filed. On the other hand, unless the party acts in good faith in disclosing to the prosecuting attorney *all* material facts that are known to him, probable cause does not exist. *Coniglio v. Snyder*, 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied); *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 627 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

Here, the Hon. Benjamin Euresti testified that the Hon. Mervyn Mosbacker, the First Assistant Cameron County District Attorney, had the discretion to present Dr. Zavaleta's case to the grand jury. After Dr. Zavaleta was indicted, the Hon. Sharon

MacRae, a special prosecutor, was in charge of prosecuting Dr. Zavaleta. The Hon. Benjamin Euresti testified that some months after Dr. Zavaleta was indicted, Meszaros told the Hon. Sharon MacRae that he (Meszaros) thought Dr. Zavaleta was an "honest man" and that he did not feel compelled, as a result of the conversation with Dr. Zavaleta, to deposit BFI's money with IBC. The Hon. Sharon Mac-Rae considered this information to be important in showing a lack of criminal intent on Dr. Zavaleta's part and necessary to support the indictment. Meszaros did not convey this information to the district attorney's office prior to the time that the Hon. Mervyn Mosbacker sought the indictment. According to the Hon. Benjamin Euresti, if the Hon. Mervyn Mosbacker had been apprised of this information, he would not have sought the indictment. This is ample evidence to show that Meszaros did not make a full and fair disclosure of the facts and circumstances to the district attorney's office. Meszaros did not make a full and fair disclosure as the law requires in such a situation. This misrepresentation of the facts (failure to make a full and fair disclosure), upon which the prosecution was based, indicates a lack of probable cause.

Malice can be inferred from want of probable cause and from wrongful conduct in reckless disregard of the rights of another, even when there is no direct proof of the same. *Gulf, C. & S.F. Ry. Co. v. James,* 73 Tex. 12, 10 S.W. 744, 747 (1889); *Bass v. Metzger,* 569 S.W.2d 917, 922 (Tex. App.—Corpus Christi 1978, writ ref'd n.r.e.). Here, BFI actively sought Dr. Zavaleta's assistance in obtaining the contract. Dr. Zavaleta had voted to award the contract to BFI. Later, he changed his mind and voted to reopen the negotiation process. The evidence showed that at this point, Meszaros shook and wagged his finger at Dr. Zavaleta. BFI did not receive the contract, and, according to the record, Dr. Zavaleta's vote cost BFI millions of dollars. Meszaros, on his own volition, spoke with the prosecuting authorities concerning the contract negotiation process. Once the district attorney's office told him

that Dr. Zavaleta's conduct was criminal, Meszaros gave a sworn statement, leaving out some relevant information. This is the evidence necessary to show that Meszaros misrepresented facts to the district attorney's office. These misrepresentations were material in determining whether Dr. Zavaleta should have been prosecuted. This evidence supports a finding that Meszaros acted with malice. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951).

Viewing the evidence in the light most favorable to the verdict, I would hold that all of the evidence introduced at trial was sufficient to support the jury's finding that Meszaros, acting without probable cause and with malice, caused, or aided or cooperated in causing, a criminal prosecution to be commenced against Dr. Zavaleta.

The majority also reversed this case on the grounds that the trial court submitted the improper definition of probable cause and did not instruct the jury on full and fair disclosure. The trial court submitted the same definition of probable cause as that used in *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983) and *Ramsey v. Arrott,* 64 Tex. 320, 323 (Tex.1885) (*Akin* and *Ramsey* were malicious prosecution cases.). The majority concluded that when, as in this case, the indictment is caused indirectly through the aid or cooperation of the person charged with malicious prosecution, the definition of probable cause should have inquired whether Meszaros actually believed Dr. Zavaleta made the statements, regardless of whether they were actually made. The majority cited *Coniglio v. Snyder,* 756 S.W.2d 743 (Tex.App.—Corpus Christi 1988, writ denied) as authority for this proposition. *Coniglio,* in turn, relied on *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). After a careful reading of *Coniglio* and *Marathon Oil,* you would find that they did not decide this issue and, therefore, do not support the majority's conclusion.

Regarding the instruction on full and fair disclosure, an instruction or definition is properly submitted if it finds support in

any evidence of probative value or in the reasonable inferences that may be drawn therefrom, and it may be of some assistance to the jury in answering the issues submitted. *Sappington v. Younger Transport. Inc.,* 758 S.W.2d 866, 867 (Tex. App.—Corpus Christi 1988, writ denied); *see also* Tex.R.Civ.P. 277. A trial court has considerable discretion in submitting explanatory instructions and definitions. *Wisenbarger v. Gonzales Warm Springs Rehabilitation Hosp., Inc.,* 789 S.W.2d 688, 692 (Tex.App.—Corpus Christi 1990, writ denied); *Wakefield v. Bevly,* 704 S.W.2d 339, 350 (Tex.App.—Corpus Christi 1985, no writ). The applicable standard of review in this court is abuse of discretion. *Lumbermans Mut. Casualty Co. v. Garcia,* 758 S.W.2d 893, 894 (Tex.App.—Corpus Christi 1988, writ denied); *Home Ins. Co. v. Gillum,* 680 S.W.2d 844, 849 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.).

Whether Meszaros' sworn statement to the district attorney's office was untrue is an evidentiary issue. Evidentiary issues need not be submitted to the jury. *Clark v. McFerrin,* 760 S.W.2d 822, 826 (Tex. App.—Corpus Christi 1988, writ denied); *Estate of Lee v. Continental Trailways,* 564 S.W.2d 392, 394 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.). I would find no abuse of discretion.

The judgment of the trial court should be affirmed.

GILBERTO HINOJOSA, J., joins in the dissent.

## OPINION ON MOTIONS FOR REHEARING

SEERDEN, Justice.

Appellee and appellants filed motions for rehearing in the instant case. We granted the motions and permitted oral argument en banc.

Appellee's first two points of error deal with the propriety of this Court's rendering its original opinion en banc when the case had been originally heard by a three-judge panel, two of whom disagreed with the opinion. Because the case has now been submitted to the entire Court, these points are now moot.

We have carefully considered appellee's remaining points of error on rehearing, points three through eleven, and believe our original opinion of October 10, 1991, adequately addresses the matters raised in these points. Consequently, we expressly adopt the original opinion of the Court and overrule appellee's motion for rehearing.

In addition, having considered appellants' motion for rehearing, we overrule it as well.

NYE, Chief Justice, dissenting.

I respectfully adopt the dissenting opinion delivered and filed on the 10th day of October, 1991.

The motions for rehearing should be granted.

GILBERTO HINOJOSA, J., joins in this dissent.