**BROWNING–FERRIS INDUSTRIES, INC., and James R. Meszaros, Appellants,**

v.

**Kenneth J. LIECK and Nydia Hinojosa Lieck, Appellees.**

No. 13–90–364–CV.

Court of Appeals of Texas, Corpus Christi.

Nov. 19, 1992.

Rehearing Overruled Feb. 11, 1993.

928

930

Lisa D. Powell, Charles C. Murray, Atlas & Hall, McAllen, Professor William Powers, The University of Texas, School of Law, Austin, Roger Townsend, Fulbright & Jaworski, Houston, for appellants.

Norton A. Colvin, Jr., Rodriguez, Colvin & Chaney, Brownsville, Gordon L. Briscoe, Harlingen, Neil E. Norquest, McAllen, for appellees.

## MAJORITY OPINION

GILBERTO HINOJOSA, Justice.

Kenneth and Nydia Lieck filed suit alleging that Browning–Ferris Industries, Inc. (BFI), through its agent, James Meszaros, made false and incomplete statements which caused a criminal prosecution to be filed against Kenneth Lieck, and that the statements were made with malice and without probable cause to believe that a crime had been committed. The jury agreed, and found BFI and Meszaros liable for malicious prosecution and loss of consortium, and awarded damages to Kenneth and Nydia Lieck. The trial court granted judgment non obstante veredicto against Nydia Lieck's loss of consortium claim. By thirty points of error appellants, James Meszaros and Browning–Ferris Industries, Inc., seek reversal and rendition of the trial court's judgment. Appellant, Nydia Lieck, seeks reversal of the trial court's judgment

non obstante veredicto against her. We modify and affirm Kenneth Lieck's judgment and reverse and render judgment in favor of Nydia Lieck.

## FACTS

In 1985 the City of Brownsville sought to privatize garbage collection. At a public meeting on January 22, 1985, James Meszaros, a BFI employee, appeared and promoted an exclusive ten-year contract between BFI and the City. He wanted the contract awarded with no competitive bidding. Meszaros handed out copies of BFI's standard-form contract as an example of what BFI and the City should execute.

The City Charter prohibited exclusive contracts. Accordingly, Kenneth Lieck, the City Manager, requested proposals from several garbage collection companies. After analysis, the matter was tabled, in part, because of an upcoming city election.

During the election, BFI attempted to make a "campaign contribution" to one of the Brownsville City Commission members, Jesse Sloss. Although the facts were controverted, some evidence showed that the Commissioner refused the contribution because the garbage contract was pending and BFI was a competitor. At trial Meszaros stated that the campaign contribution was solicited by Emilio Hernandez, who was the mayor. Hernandez denied requesting the contribution.

On January 21, 1986, after the city election, the City Commission decided to move forward on privatization. More proposals were requested and submitted. On February 25, 1986, the City Commission met to consider four proposals from garbage collection companies, including one from BFI. Before the meeting, Lieck analyzed, summarized, and compared each proposal, and developed a packet of information. The City's policy was to distribute this information to the Commission members and the news media, and to keep a copy on file for

the public.[2]

During this meeting, Robert Torres, a representative from Garbage Management Services (GMS), appeared and urged the Commission to consider his company. He argued that GMS could provide lower rates for service than BFI, and would offer more for the City's old equipment. The Commission, however, voted four to one to instruct Lieck to negotiate a contract with BFI.

BFI had a form contract, plaintiffs' exhibit 70, which was, with minor variations, in effect in many cities in Texas. Meszaros admitted that this was a public document. In fact, the evidence showed that he had distributed this contract to members of other city commissions as a proposed form contract between BFI and the cities he solicited. He also distributed this document to members of the Brownsville City Commission. BFI's competitors used an almost identical form contract.

The City and BFI negotiated minor changes to this form contract by inserting a fee for use of the City's landfill, a billing fee, and by making several other changes. A final draft was prepared.

At this point, the rates in the contract had been discussed and accepted by the Commission. These rates were $8.00 per ton for use of the landfill and a 3% billing fee. The rates concerning insurance coverage, the surety bond, and the 5% franchise fee were part of the form contract, and were not changed from the form. The disposal and billing fees were public information because they were debated and discussed at the City Council's open meetings, and they were part of a contract which was made available to the public.

The next meeting was set for March 4, 1986. At trial, Lieck testified that, as in the previous meeting, a packet of information was distributed to the Commissioners, the news media, and the public. Significantly, the packet contained the proposed contract between BFI and the City. Lieck testified that at that point the contract, and the figures it contained, was a public document, and not confidential. At the meeting the Commission voted to table the negotiations.

Robert Torres, the GMS representative, testified that, in the meantime, he obtained information regarding other competitors' proposals and, based on this information, he prepared a comparative analysis of all bids. This analysis, which he submitted to the City, showed GMS offering the City a better deal.

On March 17, 1986, Lieck wrote a letter to the Commissioners detailing, analyzing, and comparing the rates offered by each company, including those offered by BFI. The letter disclosed that GMS offered $100,000 more for the City's old equipment than BFI offered. This letter was made public pursuant to the City's policy of releasing information to the press. The next day, the Commission voted to cancel contract negotiations with BFI and to initiate negotiations[3] with GMS. As before, the rates for the services, *i.e.*, insurance coverage, the surety bond, the landfill fee of $8.00, the franchise fee of 5%, and the billing fee of 3% were set by the Commission. Only the residential and commercial pickup rates and other details of the contract needed to be negotiated.

---

2. This information could have been considered public under several sections of TEX.REV.CIV.STAT. ANN. art. 6252–17a (The Open Records Act) and art. 6252–17 § 3(b) (The Open Meetings Act). Failure to disclose public information when requested constitutes Official Misconduct. *See* Article 6252–17a § 10(b) and (f).

3. At this point the distinction between two-party negotiations and a sealed bid is important. In the sealed-bid process, certain contractual requirements are established by the City. All bids are confidential until they are opened. Confidential information in bids is not open for pub-

lic inspection at any time. TEX.LOCAL GOV.CODE ANN. § 252.049(a) (Vernon 1987). The low bidder gets the contract.

In a negotiation process, terms are specified and negotiated between the parties. Often, before a sealed bid is requested or negotiations between a single party are initiated, proposals are solicited. If provided in requests for proposals, the proposals are kept confidential until they are opened, but not thereafter unless they contain confidential information. § 252.049(b).

Meszaros knew and admitted that this was not a sealed bid process, but rather a negotiated contract.

After the vote, Torres asked Lieck whether GMS or the City would provide an initial draft of the proposed contract between GMS and the City. Lieck responded that the City would provide the contract. On April 7, 1986, Lieck gave Torres a slightly modified version of the contract he negotiated with BFI. This contract was based on BFI's form contract. It included terms covering the fees, the insurance and the bond, all of which were public information. This is plaintiffs' exhibit 79. GMS, of course, had its own residential and commercial rate schedule, which became part of the negotiation. This contract was almost identical in its relevant portions to the contract earlier negotiated between BFI and the City, plaintiffs' exhibit 5A, and the form contract, plaintiffs' exhibit 70. Plaintiffs' exhibit 79 and plaintiffs' exhibit 5A included the franchise fee, the billing fee, and the disposal fee, as well as the boilerplate terms of the contract. The contract Lieck gave to Torres, plaintiffs' exhibit 79, formed the basis of the negotiations between GMS and the City.

Meszaros tried to turn things around. He made phone calls and sent letters to Commission members. He was successful, and on April 29, 1986, the City solicited a last round of proposals. The request for proposals was specifically based on BFI's contract, including the franchise fee, the billing fee, the disposal fee, and the other contract terms. The City Commission awarded the contract to GMS.

Subsequently, the Texas Rangers initiated an investigation of the purchasing department in the Brownsville City Government. The evidence showed that Meszaros was aware of the investigation and feared that his attempted campaign contribution to Sloss would be discovered. He asked one of his employees to relay all news reports and other information to him. Meszaros also asked Dan North, a BFI employee and past Texas Ranger, to inquire into the investigation. North called Rudy Rodriguez, a Texas Ranger involved in the investigation. North set up a meeting with Rodriguez.

Two days later, on December 17, 1986, Ranger Rodriguez and Joe Garza, an investigator from the Cameron County District Attorney's office, traveled to Houston to meet with Meszaros. Meszaros brought up the issue of the garbage contract. When the investigators informed Meszaros that Lieck gave the contract to Torres, he told the investigators the contract was confidential. North provided a copy of a law book to Rodriguez and Garza, and they concluded Lieck violated the law by disclosing the contract. Meszaros did not notify the investigators that the contract was public information or that he thought Lieck was innocent, although he admitted at trial that he always believed Lieck was innocent, and that he knew that the form contract was public information.

At the meeting, Meszaros signed a statement detailing his version of the events. This statement concluded: "The contract of BFI was solely to be used by the City of Brownsville for their own use in reaching an agreement on the contract between BFI and the City of Brownsville and nobody else."

Later, on January 30, 1987, Meszaros swore in an affidavit that:

My name is James R. Meszaros. I am employed as Director of Marketing, Southwest Region for the Browning–Ferris Industries (BFI) in Houston, Texas.

On December 18, 1986, I gave a statement to Investigator Joe V. Garza about the garbage contract that B.F.I. had been negotiating with the City of Brownsville. At this time, I would like to add to this statement that during the time that I was negotiating this garbage contract with City Manager Kenneth Lieck, and I had turned over to him a number of proposals for B.F.I., during this time that we were negotiating a contract, it was on one occasion that Kenneth Lieck told me that he had checked with City Attorney Kip Hodge about B.F.I. proposals being released or shown to another bidding company and that Kip Hodge had told Kenneth Lieck that these proposals were public records and could be shown to other companies.

I (James Meszaros) told Kenneth Lieck that our proposals had never been used as public records and we had not authorized for anybody to make our proposals public records. Being that Attorney Kip Hodge had told Kenneth Lieck that he had made it public record, there was not much that we could do at this time. When we, B.F.I. turned in our actual garbage contract to the City of Brownsville by our Attorney Dan Rentfro, we made sure that our contract was not turned in until the last minute of the deadline that the City of Brownsville had put down. The reason we wanted to wait until the last minute of the deadline was because we did not want for our proposal or contract to be shown to other companies nor for this contract to be made public record for other companies. *I would like to add that, I nor any other person representing B.F.I., never authorized the City of Brownsville, nor its officials to copy nor make public records B.F.I. contract.* (Emphasis added).

Meszaros asked Richard Freed, the BFI company lawyer, to give a statement regarding the confidentiality of the agreement. He stated that:

Throughout the course of the negotiations between BFI and the City, BFI never authorized the City or any of its employees to utilize the BFI Solid Waste Collection Contract for any purpose other than to evaluate BFI's proposal and to conclude a final contract with BFI for collection and disposal of solid waste in the City. In particular, BFI never authorized the City or any of its employees to utilize the BFI Solid Waste Collection Contract as a form of agreement between the City and any other person or entity providing solid waste collection and disposal services in the City. *The BFI Solid Waste Collection Contract*

*constitutes proprietary information of BFI to be used only for the purpose intended as outlined above.* (Emphasis added).

This statement referred to plaintiff's exhibit 5A, the contract BFI and Lieck negotiated. All of these statements were provided to the prosecuting authorities.

Lieck was indicted on February 25, 1987, for Official Misconduct.[4] The indictment charged that:

Kenneth Lieck on or about the 7th day of April, 1986, ... did then and there unlawfully, intentionally and knowingly distribute to Robert Torres *confidential information* in the custody of the City Commission of the City of Brownsville which, if released, would give advantage to competitors and bidders, said information being the content of a Contractor's Proposal for Solid Waste Collection and Disposal submitted to the City of Brownsville by Browning–Ferris Industries. (Emphasis added).

The indictment was completely premised upon the confidentiality of the Contractor's proposal, *i.e.*, the contract form, terms, or rates contained in the BFI proposal. The evidence also showed that the indictment was largely based on BFI's statements. For example, Garza, the investigator from the Brownsville D.A.'s office, testified that without the statements and information from BFI, there would not have been a case against Lieck. Ben Euresti, the District Attorney, testified that they relied on the truthfulness, accuracy, and completeness of BFI's statements.

Mervyn Mosbacker, the Assistant District Attorney in charge of the State's case against Lieck, testified that Lieck was indicted for disclosing the "numbers and figures" in the contract, and not the contract in its entirety.[5] However, the indictment

---

**4.** Lieck was indicted for official misconduct; however, it is unclear whether he was indicted under TEX.PENAL CODE ANN. § 39.01(a)(1), or (a)(2), or for a violation of the Open Records Act, TEX.REV.CIV.STAT.ANN. art. 6252–17a (Vernon 1985).

**5.** Appellants repeatedly argue that Mosbacker's testimony on this issue, and others disproves "as

a matter of law" certain aspects of appellees' case. We disagree. The jury was free to disregard any, all, or part of his testimony, particularly since it primarily involved evidentiary issues. *See Lemond v. Jamail,* 763 S.W.2d 910, 913 (Tex.App.—Houston [1st Dist.] 1988, no writ); *Williams v. Lemens,* 609 S.W.2d 596, 600 (Tex.Civ.App.—Austin 1980, no writ) (testimony

stated that Lieck was indicted for distributing the entire document. Irrespective of the actual basis for the indictment, the evidence showed that Meszaros falsely informed the authorities that the contract, and by implication, all of its terms, were confidential.

As a result of the indictment, Lieck's reputation was severely damaged. He lost his job and could not find work. His standing in the community was destroyed.

This indictment was dismissed on March 30, 1987, because of problems in the makeup of the grand jury. District Attorney Ben Euresti, removed Mosbacker from the case and requested a no bill from the grand jury. The case was then dismissed.

Lieck filed this action seeking recovery for emotional distress and the injuries he suffered to his reputation. At trial, the jury found for him on all issues.

BFI appeals by thirty points of error. Points one through nine complain of the legal and factual sufficiency of the evidence supporting liability. Points ten through fifteen allege charge error. Points sixteen, seventeen, and eighteen argue that certain evidence supporting the punitive damages award was erroneously admitted. Points nineteen through twenty-four complain that the punitive damages were improperly awarded. Points twenty-five through thirty assert constitutional challenges to punitive damages.

## LEGAL AND FACTUAL SUFFICIENCY POINTS OF ERROR

We first address the legal and factual sufficiency of the evidence supporting liability. The first three points of error challenge the evidence supporting the answer to question one, the liability question. The fourth through sixth points challenge the evidence supporting question two which asked if appellants made a full and fair disclosure. Points seven though nine challenge the evidence supporting the jury's finding of causation.

■ As an initial matter we dispose of points three, six, and eight. These points argue "There is no positive, clear, and satisfactory evidence [supporting the jury's answer to question 1, 2, and the proximate cause issue]." Appellants are apparently attempting to challenge the sufficiency of the evidence under a higher standard than the traditional legal and factual sufficiency standards. We recognize that the malicious prosecution cause of action must be proven by clear and convincing evidence. However, in Texas, only two standards of evidentiary review exist. *Meadows v. Green*, 524 S.W.2d 509, 510 (Tex.1975). These points do not correspond to either standard, and do not raise a valid point of error.

■ Moreover, this case was submitted to the jury without objection under the preponderance of the evidence standard. This error became the law of the case. Points three, six and eight present nothing for review, and are overruled.

We now address appellant's challenges to the legal and factual sufficiency of the evidence supporting liability. A "no evidence" or "insufficient evidence" point is appropriate if the party without the burden of proof challenges a finding of fact. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). The scope of review for a no evidence point encompasses all the evidence and reasonable inferences which tend to support the finding of fact or jury verdict, and no other evidence. *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex.1990). The no evidence standard of review requires us to overrule the point if, viewing the evidence and inferences in the light most favorable to the finding, there is any evidence of probative force to support the finding. *Id.*

On the other hand, the scope of review for an insufficient evidence point encompasses all the evidence which supports and contradicts the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). This includes all relevant evidence

of interested or expert witness may be disregarded). Arguably, Mosbacker was an interested witness because he was attempting through

out trial to vindicate his actions seeking Lieck's indictment. Moreover, much of his testimony is contradicted by other evidence.

on the issue. The insufficient evidence standard requires us to sustain this point only if the totality of the relevant evidence supporting the finding is so weak, or the conflicting evidence is so strong, that the finding is against the great weight and preponderance of the evidence and is manifestly wrong and unjust. *Id.*

An action for malicious prosecution may be maintained if the plaintiff proves: 1) the commencement of a criminal prosecution against the plaintiff; 2) which has been caused by the defendant or through the defendant's aid or cooperation; 3) which terminated in the plaintiff's favor; 4) that the plaintiff was innocent; 5) that there was no probable cause for the proceedings; 6) that it was done with malice; and 7) that it damaged the plaintiff. *Euresti v. Valdez,* 769 S.W.2d 575, 578 (Tex.App.—Corpus Christi 1989, no writ); *Ellis v. Sinton Savs. Ass'n,* 455 S.W.2d 834, 836 (Tex.Civ. App.—Corpus Christi 1970, writ ref'd n.r.e.). There is no dispute that a criminal prosecution was commenced against Lieck, which was terminated in his favor because he was innocent. Appellants' challenges primarily relate to the issues of causation, probable cause, lack of full and fair disclosure, and malice.

## CAUSATION

The first issue we address is whether sufficient evidence showed BFI's statements and actions caused the indictment. The jury was asked did Meszaros "cause, aid, or cooperate in causing" the criminal prosecution. The jury found appellants caused the indictment.

■ The indictment required proof that Lieck distributed confidential information. The statements made by Meszaros and Freed expressly or implicitly indicated to the very authorities who later sought Lieck's indictment that the information Lieck gave to Torres was confidential. Mosbacker, the Assistant District Attorney, testified that he believed certain terms in the BFI contract were confidential. And, based on this belief, he sought Lieck's indictment for improperly distributing this information. Thus, this evidence supports the jury's finding that Meszaros caused, aided, or cooperated in causing Lieck's indictment.

In addition, Meszaros did not disclose information which would have exculpated Lieck. Meszaros did not state that the contract was within the public domain. He did not state that the terms plugged into the form contract had been discussed in open meetings. He did not state that the contract could give no advantage to competitors because GMS had been selected by the City as the contractor before April 7, and was not a competitor.

Euresti, the District Attorney, testified that they relied on the truthfulness, accuracy, and completeness of BFI's statements in seeking the indictment. Garza stated that without the statements and information from BFI there would not have been a case against Lieck.

We hold that the foregoing evidence is legally and factually sufficient to sustain the jury's finding of causation. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988) (providing information to authorities who later indict is legally sufficient evidence of causation); *Eans v. Grocer Supply Co.,* 580 S.W.2d 17, 22 (Tex.Civ. App.—Houston [1st Dist.] 1979, no writ); *Restatement (Second) of Torts,* § 655 (1977); *see Farley v. M M Cattle Co.,* 529 S.W.2d 751, 756 (Tex.1975) (causation is a particularly apt question for the jury). Appellant's seventh and ninth points are overruled.

## FULL AND FAIR DISCLOSURE

Appellants' fourth and fifth points challenge the legal and factual sufficiency of the evidence supporting the jury's finding in question two that appellants did not make a full and fair disclosure of information to the authorities. Appellants present two arguments. First, they argue that the evidence conclusively shows that charges were brought at the prosecutor's discretion, thus they are not liable as a matter of law. Appellants also argue that appellees were required to prove that appellants made a knowing false statement to the authorities, and that such proof is lacking.

In *Andrews v. Dewberry*, 242 S.W.2d 685, 688 (Tex.Civ.App.—Fort Worth 1951, writ ref'd n.r.e.), the Court wrote:

> The advice of the prosecuting attorney [to sign a complaint] is a complete defense when it appears that the defendant, before filing the complaint, made a full and fair disclosure of all the facts within his knowledge.... But a disclosure to the prosecuting attorney is not a defense if the defendant made false statements concerning material matters to the prosecuting attorney *or if material facts are withheld.* (emphasis added) *Andrews,* 242 S.W.2d at 688. *See also Fisher v. Beach,* 671 S.W.2d 63, 66 (Tex. App.—Dallas 1984, no writ); *Terk v. Deaton,* 555 S.W.2d 154, 156 (Tex.Civ.App.—El Paso 1977, no writ). The informant need only make a full and fair disclosure to avoid liability. If charges are then filed, the "exercise of the officer's (prosecutor's) discretion makes the initiation of the prosecution his own, and protects (the informant) from liability." *Andrews,* 242 S.W.2d at 688.

If the fully informed prosecutor exercises his discretion to bring suit, his actions become the sole cause of the prosecution. This breaks, as a matter of law, the chain of causation from the informant's disclosure and becomes an intervening cause. If the prosecutor is not fully informed, or falsely informed, an intelligent exercise of his discretion becomes impossible. *Id.; see also Restatement (Second) of Torts § 653 comment g* (Knowing false statement to prosecutor makes the intelligent exercise of his discretion impossible). Accordingly, the "defense" of the prosecutor's discretion does not apply absent full and fair disclosure. The dispositive issue is whether the evidence supports the jury's finding that appellants did not fully and fairly disclose information to the authorities.

In *Eans,* the court discussed the standard by which full and fair disclosure is measured. The court wrote: "The reporting party is required to bring to the attention of the prosecuting attorney all material facts known to him relating to the matter, including facts from which the district attorney by making further investigation might determine that the accused was not guilty of any offense." *Id.* at 580 S.W.2d at 21.

The evidence showed that Meszaros did not disclose facts exculpating Lieck, while at the same time he disclosed facts implicating him. He did not state that the form contract was a public record. He did not state that the terms and rates incorporated into the document Lieck gave to Torres were public because they were discussed at public meetings. He did not state that the document Lieck gave to Torres was not confidential, even though he knew it was not. He did not state that he knew Lieck was innocent, despite the fact that Lieck was being investigated at his suggestion.

We find this evidence legally and factually sufficient under *Eans* to sustain the jury's finding that Meszaros failed to fully and fairly disclose "all material facts known to him relating to the matter." *See Compton v. Calabria,* 811 S.W.2d 945, 952 (Tex.App.—Dallas 1991); *Fisher,* 671 S.W.2d at 66; *Lloyd v. Myers,* 586 S.W.2d 222, 227 (Tex.Civ.App.1979, writ ref'd n.r.e.); *Eans,* 580 S.W.2d at 21. Accordingly, appellant's argument that the prosecutor's discretion protects them from liability fails.

Appellants also argue that the evidence failed to show a knowing false statement, as required by *Thomas v. Cisneros,* 596 S.W.2d 313 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.) and the *Restatement (Second) of Torts § 653 comment g,*[6] and

---

6. *Comment g* provides:

INFLUENCING A PUBLIC PROSECUTOR. A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes

thus judgment should be rendered in their favor. We disagree that Texas law requires proof of a knowing false statement.

The Supreme Court of Texas has never held that proof of a knowing false statement was necessary for liability in a malicious prosecution case. Recent cases in which the plaintiffs have prevailed have not mentioned a knowing false statement as a necessary part of the plaintiff's proof. *See Esquivel v. Watson,* 823 S.W.2d 589, 591 (Tex.1992); *Davis,* 752 S.W.2d 518, 522 (Tex.1988) (prosecutor filed charges); *Akin v. Dahl,* 661 S.W.2d 917, 920–21 (Tex.1983).

■ Texas decisions have stated or held that a knowing false statement or lack of a full and fair disclosure is **evidence** of several elements of the cause of action. For example, a knowing false statement is evidence of causation, lack of probable cause, lack of full and fair disclosure, and malice; lack of full and fair disclosure is evidence of causation, lack of probable cause, and malice. *See e.g. Compton,* 811 S.W.2d at 950; *Coniglio v. Snyder,* 756 S.W.2d 743, 747 (Tex.App.—Corpus Christi 1988, writ denied) (no evidence of lack of full and fair disclosure or false statement, judgment for plaintiff reversed); *Fisher,* 671 S.W.2d at 67 (knowing false statement is evidence of causation, lack of probable cause, and malice); *Eans,* 580 S.W.2d at 21; *Thomas,* 596 S.W.2d at 317; *Bass v. Metzger,* 569 S.W.2d 917, 922 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Lloyd,* 586 S.W.2d at 228 (false accusation of crime is evidence of lack of probable cause and malice); *Terk v. Deaton,* 555 S.W.2d 154, 156 (Tex.Civ. App.—El Paso 1977, no writ). Thus, false statements to the authorities are sufficient evidence to prove certain aspects of a malicious prosecution case, but such proof is not necessary. It follows that knowing false statements are merely evidentiary, and a question need not be submitted to the jury.

*Thomas,* appellants' main case, did not hold that a knowing false statement was necessary. In *Thomas* the informant, who worked with the accused at the State Board of Insurance, was a member of one of two grand juries. One grand jury was investigating the Board and an insurance company. The informant's grand jury was not involved in this investigation. The accused stated to the informant: "well, I hope you are not after the chairman, you might not be here the next day."

This statement was reported to the District Attorney by another grand juror. An Assistant District Attorney approached the informant for information on the statement made by the accused. After questioning, the informant reluctantly informed the Assistant District Attorney of the statement and of the accused's identity. The District Attorney then filed a complaint alleging Retaliation. TEX.PENAL CODE ANN. § 36.06 (Vernon 1974). Charges were subsequently dropped. The accused then filed suit against the informant for malicious prosecution. The trial court granted summary judgment. The appellate court affirmed.

Although *Thomas* quotes *comment g,* the court specifically found that the appellee (informant) had made a full and fair disclosure. Appellant had argued that full and fair disclosure required that appellee disclose appellant's "reputation as a jokester and his knowledge that she was not serving on the grand jury investigating the

---

to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in this Section even though the information proves to be false and his belief is one a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the officer's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Insurance Commission." *Thomas* at 317. The court responded:

> Appellee was only required to state the objective facts as they were known to her. Any statements by her as to appellant's reputation around the Insurance Commission or the knowledge of others as to her grand jury assignment would have been objectionable at trial as hearsay. *These are not the kind of objective facts "full and fair disclosure" would require.*
>
> Furthermore, appellee had no duty to investigate appellant's motives or state of mind. It is undisputed that the facts given to the District Attorney were true.

*Id.* at 317–18. (Emphasis added). The court further found that there was no evidence suggesting that the informant had desired to initiate proceedings against the accused, nor that this desire was a determining factor in the initiation of the proceedings:

> [T]he criminal charges were filed by the District Attorney as a unilateral exercise of his discretion. This made the prosecution the sole endeavor of the District Attorney ...

*Id.*

*Thomas* hardly stands for the proposition that a knowing false statement is required in these types of malicious prosecution cases. The court's quotation of *comment g*, without discussion, is merely *dictum* since it was unnecessary to its holding that full and fair disclosure was made.

■ We also do not believe that *comment g* requires proof of a knowing false statement under the facts of this case. *Comment g* states that "giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer *if it is left entirely to his discretion to initiate proceedings or not.*" (emphasis added). Obviously providing a "knowing false statement" to a prosecutor makes "an intelligent exercise of his discretion ... impossible." *Id.* However, other actions and statements by an informer could just as significantly affect a prosecutor's discretion to initiate criminal proceed-

ings against an innocent individual. The facts in this case present such a situation.

The decision to bring charges was *not* left entirely to Mosbacker's discretion. The evidence before the jury tended to show that Meszaros provided Mosbacker information which only implicated Lieck, and did not disclose information which exculpated him. This tainted the prosecutorial process just as surely as would have a knowing false statement, and made "the intelligent exercise of the officer's discretion ... impossible." *Comment g.*

■ The policy arguments for requiring a knowing false statement before informants become liable are simply not compelling on the facts of this case. A much more compelling situation for requiring a knowing false statement is the case in which the prosecutor initiates contact and requests information from a citizen, but the citizen is unwilling to talk because of the threat of civil liability or other reasons. *See Thomas,* 596 S.W.2d at 318 (The prosecutor "confronted appellee with the incident, but she refused to reveal any information. Finally she agreed to be a witness if someone could be found to corroborate her story. This was the extent of her involvement in the prosecution.") These facts are clearly not present here.

■ In the usual case in which the citizen fulfills his or her public duty to report a crime, many safeguards already exist which shield the citizen from liability. The clear and convincing standard of proof of both malice and lack of probable cause present more than adequate protection for the wrongly accused. Moreover, proof of a full and fair disclosure exculpates the citizen.

Following Texas case law and addressing the concerns of *comment g*, we hold that under the facts of this case the appellee was not required to prove that appellant made a knowing false statement. Liability for malicious prosecution attached here because appellee proved that appellants caused the prosecution, with malice, without probable cause, and failed to make a full and fair disclosure of all material facts

to the authorities. The jury so found, and we hold the evidence is sufficient to support the verdict. We overrule points four and five.

Points one and two complain that the evidence was not legally and factually sufficient to support the answer to question one. This question asked whether Meszaros caused the prosecution without probable cause and with malice. We have addressed the causation issue above, and address here the remaining questions which are whether the evidence supported the jury's finding of probable cause and malice.

## PROBABLE CAUSE

■ Appellants next argue that the evidence is legally and factually insufficient to support the jury's finding that appellants caused the charges to be brought without probable cause to believe Lieck was guilty. Probable cause has been defined as the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted. *Akin v. Dahl,* 661 S.W.2d 917, 920–21 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).

■ The *Akin* Court noted that this is an objective standard. However, other courts have determined that probable cause does not exist if the informer does not actually believe that a crime has been committed. *See Compton,* 811 S.W.2d at 950 (The question is not what the actual facts were, but what the prosecutor honestly and reasonably believed the facts to be); *Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex. App.—Corpus Christi 1988, writ denied); *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 627 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Thus, lack of probable cause may be proven if a reasonable person would not believe the plaintiff was guilty or if the informant did not actually believe the plaintiff was guilty.

The evidence was sufficient for the jury to find that a reasonable person would not have believed Lieck was guilty. For Lieck to be guilty, he must have distributed confidential information to Torres. However, the evidence showed that the contract was not confidential. Meszaros requested Freed to make the statement that the contract was "proprietary." Yet, he admitted that BFI's form contract, plaintiffs' exhibit 70, was a public record. It had been executed with other cities and could not be confidential as a matter of law. Tex.Rev. Civ.Stat.Ann. art. 6252–17a § 6(3) (Vernon 1985). This document was almost identical in material respects to the contract Lieck gave to Torres, plaintiffs' exhibit 79. Meszaros was intimately familiar with both documents. Thus, he must have known that the contract was not confidential, and therefore that Lieck had not violated the law.

Meszaros also knew a variation of the form contract had been negotiated with the City. He knew the City did not consider the contract confidential. He knew the contract and all of its terms had been publicly discussed at open meetings and therefore could not be confidential as a matter of law. *See generally* Tex.Rev.Civ.Stat. Ann. art. 6252–17 (Vernon 1985) (it is implicit in the Open Meetings Act that matters discussed in public meetings are public records). He knew the City was negotiating, and not accepting sealed bids. *See* Tex.Local Gov.Code Ann. § 252.049 (Vernon 1987) (only competitive sealed bids and confidential proposals are protected, matters negotiated between the parties are not confidential by law). He knew and swore to the fact that Lieck, on the advice of counsel, had concluded it was a public document. He knew the City had a policy of releasing information regarding analysis of the contractor's proposals, thus, he knew or his knowledge was implied in law that the Act requires that this information be released to the public. Art. 6252–17a, § 6(15); *see also* § 14(a). He knew that the City was releasing information contained in each competitors' proposal because he received such information. He also knew or should have known that the allegedly confidential contract and the competitors' proposal were in no way confidential for other reasons as well. *See id.*

§ 6(1) (reports and evaluations of governmental bodies are public); and, *id.* § 6(3) (contracts dealing with the receipt or expenditure of public funds are public).

Based on this evidence, the jury was entitled to find that the contract was not confidential. Therefore, the evidence supported the jury's finding that a reasonable person would not have believed Lieck was guilty.

■ The evidence was also showed that Meszaros did not believe Lieck was guilty. Meszaros testified several times that he did not believe Lieck was guilty of any wrongdoing. Thus, the evidence supported either definition of lack of probable cause set forth above.

■ Probable cause may be established if the defendant makes a full and fair disclosure of all material facts to a prosecuting attorney. *Eans*, 580 S.W.2d at 21; *Bass*, 569 S.W.2d at 922. If the defendant relies upon the advice of a prosecuting attorney as a basis for probable cause, the plaintiff must prove lack of full and fair disclosure. We have found above that the evidence supported the jury's finding that no full and fair disclosure was made. Thus, appellants cannot rely upon the advice of a prosecutor to avoid liability.

We find the evidence legally and factually sufficient to sustain the jury's finding that Meszaros acted without probable cause to believe Lieck was guilty of a crime. *See Esquivel v. Watson*, 823 S.W.2d 589, 591 (Tex.1992).

### MALICE

■ Appellants also argue that there is no evidence or insufficient evidence supporting the jury's finding of malice. Malice was properly defined in the charge as: "intentional wrongful acts done willfully and purposely with ill will or evil motive to the injury of another or done in such reckless disregard of the rights of another and indifference as to whether the other person is injured or not as to amount to wanton and willful action knowingly and unreasonably done."

■ Several malicious motives were alleged by the plaintiffs. First, the jury could have concluded that Meszaros was attempting to divert the investigation from his abortive attempt to make a "campaign contribution" to Sloss. Second, the jury could have found that Meszaros was seeking revenge for the lost contract. Third, the jury could have found that Meszaros was attempting to get the contract bidding reopened.

■ The evidence supported these motives. BFI only cooperated after the Ranger investigation was started, and the danger that BFI would be implicated in the campaign contribution became real. BFI then directed the investigation towards Lieck and the garbage contract. BFI furthered the investigation by providing the investigators information implicating Lieck. The jury was free to conclude that Meszaros did these things with a desire to get Lieck and the others indicted for reasons other than bringing them to justice. We hold this evidence legally sufficient to support the jury's finding of malice. *Davis*, 752 S.W.2d at 522. We find it is factually sufficient as well. *Eans*, 580 S.W.2d at 22. Malice may also be inferred from the lack of probable cause, *Bass*, 569 S.W.2d at 922–23, which the jury found and which we held above was supported by the evidence.

We have reviewed the evidence supporting each element of the plaintiff's cause of action for malicious prosecution and find it legally and factually sufficient. Appellants' first and second points of error, which challenge the legal and factual sufficiency of the evidence supporting liability, are overruled.

### FIRST AMENDMENT CLAIMS

Appellants' tenth and eleventh points of error allege that the first amendment of the United States Constitution is violated if liability is imposed against BFI absent proof of a knowing false statement. In this point appellant argues that malicious prosecution cases are so similar to libel cases that the first amendment is implicated.

Like libel cases, the actionable conduct in malicious prosecution cases is speech. The particular type of speech in malicious prosecution cases is the informer's statement to the authorities. Appellant argues that in cases in which the person informed upon is a public figure, the first amendment protections relating to libelous statements made against public figures attach. Appellants cite *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), for the proposition that a knowing false statement is necessary for a public figure to recover in a libel action.

This argument was not presented to the trial court, and is not preserved. TEX. R.APP.P. 52(a). Appellants' tenth and eleventh points of error are overruled.

### CHARGE ERROR

Appellants' twelfth through fifteenth points of error complain of the charge to the jury. The charge asked:

### QUESTION 1

Did James R. Meszaros, acting without probable cause and with malice, cause, or aid or cooperate in causing, a criminal prosecution to be commenced against Kenneth J. Lieck?

Yes ___ No ___

"Probable cause" means the existence of such facts and circumstances as would cause belief in a reasonable mind, acting on the facts within the knowledge of Mr. Meszaros, that Mr. Lieck was guilty of the conduct for which he was prosecuted.

"Malice" means intentional wrongful acts done willfully and purposely with ill will or evil motive to the injury of another or done in such reckless disregard of the rights of another and indifference as to whether the other person is injured or not as to amount to wanton and wilful action knowingly and unreasonably done.

### QUESTION 2

Did James R. Meszaros fail to make a full and fair disclosure to the investigating officers?

Yes ___ No ___

The jury answered "Yes" to both questions.

Appellants argue that the jury charge was improper because 1) it did not ask whether Meszaros knowingly made a false statement to the authorities; and 2) it did not ask whether Meszaros held an actual belief that Lieck was guilty as part of the probable cause instruction.

We have discussed and decided above that a knowing false statement is not an essential element of the cause of action for malicious prosecution. Thus, to the extent appellants' points complain that the charge was erroneous for this reason, they are overruled.

■ We now address the second complaint on the charge *i.e.*, whether it was necessary to charge the jury on whether Meszaros held an actual belief that Lieck was guilty. Question one asked whether Meszaros acted without probable cause and with malice in causing or aiding or cooperating in causing the indictment against Lieck. Under the probable cause definition provided to the jury, Meszaros would be liable for malicious prosecution if 1) he caused Lieck's indictment, 2) he did not reasonably believe Lieck was guilty, and 3) that in doing this Meszaros acted with malice.

Appellants argue that under this definition of probable cause no inquiry is made as to whether Meszaros unreasonably believed that Lieck was guilty. Under appellants' interpretation of malicious prosecution law, if Meszaros believed, even though unreasonably, that Lieck was guilty, then he is not liable. Because the jury was unable to determine whether his belief was unreasonable under the probable cause definition provided, they argue the charge was harmfully erroneous. Under this theory, any error in the charge would be harmful only if the jury could have found that Meszaros unreasonably believed that Lieck was guilty.

The definition of probable cause submitted in this case has been adopted and ap-

plied without change in many Texas decisions, and is of longstanding acceptance. *See Akin,* 661 S.W.2d at 921 (citing *Ramsey v. Arrott,* 64 Tex. 320 (1885)); *Compton v. Calabria,* 811 S.W.2d 945, 949–50 (Tex.App.—Dallas 1991, no writ); *Williams v. Frank Parra Chevrolet, Inc.,* 552 S.W.2d 635, 638 (Tex.Civ.App.—Waco 1977, no writ); *J.C. Penney v. Gilford,* 422 S.W.2d 25, 30 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). We find no error in this instruction.

■ Even if the law were such that the jury was required to be charged on whether Meszaros actually believed Lieck was guilty, any such error was harmless.

In *Island Recreational Dev. Co. v. Republic of Texas Sav. Ass'n,* 710 S.W.2d 551 (Tex.1986), the Supreme Court of Texas, interpreting application of TEX.R.APP.P. 81(b)(1) to charge error held:

> To determine whether an alleged error in the jury charge is reversible, the reviewing court must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. Alleged error will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment.

*Id.* at 555.

■ In this case, lack of probable cause was not an issue because Meszaros admitted that he believed Lieck was innocent, and had done nothing wrong.[7] His belief was supported by the strong evidence reviewed in the probable cause discussion that the contract was not confidential. This evidence strongly supports Meszaros' actual belief that Lieck had done nothing wrong. Consequently, if an inquiry into Meszaros' actual beliefs is a necessary part of the charge in a cause of action for malicious prosecution, failure to inquire in this case was harmless error. TEX.R.APP.P.

81(b)(2). Points of error twelve and thirteen are overruled.

■ Points fourteen and fifteen complain that the trial court erred in failing to submit appellants' requested causation issue and that the causation issue was not properly submitted to the jury. Their argument under these points is that the causation issue was phrased so that the jury could find appellants caused the prosecution without a finding that false statements caused the prosecution.

The courts of this State have repeatedly stated that the causation issue submitted in this case is the proper question for malicious prosecution cases. *See Davis,* 752 S.W.2d at 522; *Thomas,* 596 S.W.2d at 316; *Bass,* 569 S.W.2d at 919; *Ellis,* 455 S.W.2d at 837. Points of error fourteen and fifteen are overruled.

## PUNITIVE DAMAGES

Appellants' next group of points challenge the evidence and the law regarding punitive damages. Points sixteen, seventeen, and eighteen challenge admission of testimony regarding punitive damages. Point nineteen complains of the apportionment of damages between Lieck and his wife, who sued for loss of consortium. Points twenty, twenty-one, twenty-two and twenty-three complain of the legal and factual sufficiency of the evidence supporting the jury's finding of punitive damages and their amount. Points twenty-five through thirty raise constitutional challenges to the punitive damage award.

■ Point sixteen complains that the trial court erred in admitting expert testimony relating to BFI's cash flow to prove the proper amount of punitive damages. In addition to the usual testimony regarding net worth, Everett Dillman, appellee's expert, testified that it would take .7 days for BFI to "make" $1,000,000.00 in cash flow. Appellants argue that this was improper and irrelevant. They cite *Southland Corp. v. Burnett,* 790 S.W.2d 828, 830

---

7. In such cases lack of probable cause is established as a matter of law. *See Andrews,* 242 S.W.2d at 688–89.

(Tex.App.—El Paso 1990, no writ), for the proposition that evidence of a businesses' cash flow is error. We disagree.

In *Burnett,* the court held that evidence of cash flow indicating the number of stores Southland owned, and the gross sales for each store, was improperly admitted over a relevancy objection. There are relevancy problems with cash flow evidence if, without more, it is offered to prove the proper amount of punitive damages. *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988), held that net worth was admissible to prove the amount of punitive damages. Logically, the amount of money flowing into a corporation is not necessarily probative of how much the company is worth. However, like all other evidence, cash flow may be relevant, depending upon what it is offered to prove. In this case it was offered to prove the (short) period of time in which it would take for BFI to pay a damage award. This evidence was placed in the proper context by Dillman's testimony relating to BFI's net worth. We hold the evidence was properly admitted.

 In addition, if this was error it was harmless because there was sufficient evidence of BFI's net worth to support the jury's assessment of punitive damages. TEX.R.APP.P. 81(b)(1). Appellants sixteenth point of error is overruled.

 Point seventeen complains that Dillman's testimony relating to punitive damages was improper because it is not a proper subject for expert testimony. Rule 702, TEX.R.CIV.EVID., provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise.

Net worth and other aspects of the proper amount of punitive damages are technical and specialized matters. Expert testimony may be properly admitted to assist the jury in determining the proper amount of punitive damages. Appellants' seventeenth point is overruled.

In point eighteen appellant complains that testimony regarding its financial status violates the due process and equal protection clauses of the United States Constitution.

 The first argument under this point is that evidence of BFI's net worth is unduly prejudicial and bears no rational relationship to the injury caused. This argument has repeatedly been addressed by our courts. The prevailing view is that punitive damages are proper to punish and deter. *Lunsford,* 746 S.W.2d at 471–72. Wrongdoers are not punished because they have money. Wrongdoers are punished because they cause injuries. Net worth is admissible to determine the proper degree of punishment to be assessed. Thus, admission of this evidence for this purpose does not violate equal protection.

 Appellants also argue that punitive damage awards are based on impermissibly vague and indefinite standards, and that this violates due process. This argument was rejected by this Court recently in *General Motors Corp. v. Saenz,* 829 S.W.2d 230 (Tex.App.—Corpus Christi 1992, writ granted). We wrote that punitive damages were not based on standards different or more indefinite than other types of damages, or fact findings. *Id.* at 248.

 Punitive damage awards are proper in cases involving malice. Malice was clearly defined and supported by the evidence. The jury's assessment of punitive damages here did not violate due process. *Id.* Appellants' eighteenth point of error is overruled.

 Appellant's nineteenth point of error argues that the trial court should not have awarded the entire $1.5 million punitive damage award to Mr. Lieck. They argue that, because the jury apportioned 30% of the award to Mrs. Lieck, and 70% of the award to Kenneth Lieck, he should only recover 70% of the punitive damage award. We agree.

As set forth below, the trial court erred in rendering judgment against Nydia Lieck. Thus she is entitled to the 30% of the punitive damage award which the trial

court awarded to Kenneth Lieck. Appellants' nineteenth point of error is sustained.

Appellants' twentieth through twenty-third points of error complain that the evidence is legally and factually insufficient to support the jury's award of punitive damages and their amount. Appellant requests a remittitur. Appellant argues under this point that punitive damages should not be awarded because the evidence supporting liability is insufficient. We have overruled all points of error challenging the legal and factual sufficiency of the evidence supporting liability, thus, this argument must fail.

We also note that this case involved an intentional tort. Punitive damages are particularly appropriate in cases involving intentional wrongdoing. The ratio of punitive damages to actual damages was approximately two-to-one, well within the four-to-one ratio set by the legislature for cases *not* involving intentional torts or malice. TEX.CIV.PRAC. & REM.CODE ANN. § 41.007 (Vernon 1987). We decline to suggest a remittitur. Appellants' twentieth through twenty-third points of error are overruled.

Point twenty-four alleges error in the assessment of punitive damages against BFI because its liability was caused solely by an agent or employee. Specifically, BFI complains that there were no jury findings that linked active wrongdoing by BFI to the alleged tort committed. Thus, it argues, none of the purposes of punitive damages are served by assessing punitive damages against the "nonculpable corporate defendant."

In order to assess punitive damages against a corporation for the acts of an agent, the plaintiff must plead, prove, and obtain findings that 1) the agent was employed in a managerial capacity, 2) that the agent was unfit and the principal or managerial agent was reckless in employing or retaining him, 3) the agent was performing an act authorized by the principle, or 4) the principal ratified the agent's act. *Hylander v. Groendyke Transport, Inc.*, 732 S.W.2d 692, 695 (Tex.App.—Cor-

pus Christi 1987, writ ref'd n.r.e.); *Missouri Pac. R.R. v. Dawson*, 662 S.W.2d 740, 743 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

Appellees pleaded that Meszaros was acting in his managerial capacity. The jury found that Meszaros was a managerial employee of BFI. The evidence in the instant case reveals that Meszaros was one of BFI's vice presidents. Thus, he was employed in a managerial capacity. The evidence also showed that Meszaros made significant managerial decisions before and after the investigation. Attempting to make a "campaign contribution" to Sloss, directing the investigation away from the campaign contribution and towards Lieck, and the decision to make statements to the authorities are all significant managerial decisions made by Meszaros. This evidence is sufficient to sustain the jury's assessment of punitive damages against BFI. Appellants' twenty-fourth point of error is overruled.

Points twenty-five through thirty challenge the constitutionality of punitive damage awards. Many of the arguments raised in these points of error have not been preserved because there was no objection at the charge conference to the submission of a the allegedly defective question on punitive damages. *Hernandez v. Montgomery Ward*, 652 S.W.2d 923, 924 (Tex.1983) (failure to object to defective question fails to preserve error); *Celotex Corp. v. Tate*, 797 S.W.2d 197, 207–208 (Tex.App.—Corpus Christi 1990, no writ). Nevertheless, we will address these points on the merits.

Points twenty-five and twenty-six present the argument that appellants' due process rights under the Texas and United States Constitutions were violated because there is no limit to the jury's discretion to assess punitive damages, and no meaningful instructions were given. The premise of this argument is incorrect. Numerous limits exist upon the jury's discretion to assess punitive damages, the most important of which is that the jury must assess punitive damages only in furtherance of the proper purposes of punitive damages.

These purposes are to deter future misconduct, punish wrongdoers, and to reimburse the plaintiff for remote losses. *Lunsford v. Morris,* 746 S.W.2d 471, 471–72 (Tex. 1988); *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 555–56 (Tex. 1985); *Celotex Corp. v. Tate,* 797 S.W.2d 197, 209 (Tex.App.—Corpus Christi 1990, no writ).

■■■ The jury was instructed that it could assess punitive damages to punish BFI, and to set an example for others. The instruction clearly and distinctly identified the proper purposes for punitive damages as set forth in *Lunsford* and *Cavnar,* and provided that the jury could assess such damages for these purposes. The jury's discretion was constrained in a meaningful fashion by this instruction. *See Pacific Mut. Life Ins. v. Haslip,* —— U.S. ——, ——, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991); *Saenz,* 829 S.W.2d at 249. Moreover, the evidence supported the jury's finding that punitive damages were needed to punish and penalize BFI, and the jury's finding that $1.5 million was a proper amount. Appellants' twenty-fifth and twenty-sixth points of error are overruled.

■■■ In point twenty-seven, appellant argues that due process requires that punitive damages may not be assessed absent clear and convincing evidence of malice or other intentional wrongful conduct. We recently overruled a point of error based on this precise issue in *Saenz.* The *Haslip* Court rejected the suggestion that a higher standard of proof was required by the Due Process Clause of the United States Constitution. *Haslip,* —— U.S. at —— n. 11, 111 S.Ct. at 1046 n. 11. And in *Saenz* we wrote:

> Whether an entire want of care exists in a particular case is not a fact so unique, specialized, or difficult to determine that a higher standard of proof is required. Moreover, unlike criminal cases or family law cases, the effects of most punitive damage awards are not different from ordinary damage awards. Cherished constitutional freedoms are not at issue in such cases, merely money. Like other damages, whether punitive damages are appropriate and the correct amount can readily be determined by a properly instructed jury. Prior decisions unanimously conclude that a higher standard is not required by the Texas Constitution. *See e.g. Lawson–Avila Const. Inc. v. Stoutamire,* 791 S.W.2d 584, 593 (Tex.App.—San Antonio 1990, writ denied) (citing *Ford Motor Co. v. Durrill,* 714 S.W.2d 329 (Tex.App.—Corpus Christi 1986), *writ granted on other grounds and vacated,* 754 S.W.2d 646 (Tex.1988). The legislature has also concluded that punitive damages may be awarded if a preponderance of the evidence shows fraud, malice, or gross negligence. TEX.CIV.PRAC. & REM.CODE ANN. § 41.003 (Vernon 1990).
>
> The interests at stake when punitive damages are at issue are not significantly different than liability questions or other issues in civil cases. The preponderance of the evidence standard generally applies in civil cases, and we believe it should continue to apply to punitive damage awards. *See International Armament Corp. v. King,* 686 S.W.2d 595, 597 (Tex.1985). We therefore hold that the Texas Constitution does not require a clear and convincing standard of proof for assessment of punitive damages.

*Saenz,* 829 S.W.2d at 248. Appellants' twenty-seventh point of error is overruled.

Point twenty-eight presents the argument that the punitive damage award in this case was so excessive that this Court should set aside the jury's finding. We have reviewed the legal and factual sufficiency of the evidence supporting the amount of punitive damages in points twenty and twenty-one. The evidence is sufficient to sustain the jury's findings of malice and that $1,500,000 is an amount which will adequately punish BFI. Point twenty-eight is overruled.

■■■ Point twenty-nine is a constitutional challenge to the use of wealth as a factor in assessing punitive damages. This, appellants argue, violates the Equal Protection Clause and the Due Process clause of the Texas and United States Constitutions.

In points twenty-five and twenty-six we rejected appellant's argument that their rights under the Due Process Clauses of the state and federal constitutions were violated in this case by assessment of punitive damages based on appellant's ability to pay. We perceive no violation of the Equal Protection Clauses either. According to Texas and federal law, appellants are not a member of a suspect class. *See Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982); *In the Interest of McLean,* 725 S.W.2d 696, 698 (Tex. 1987) (sex is a suspect class under the Texas Constitution). We are aware of no opinion from any court which has held that the wealthy are a suspect class. Neither are the rights complained of fundamental. The State has a substantial interest in deterring from action those who would qualify for punitive damages. Consequently, Texas laws and procedures which permit assessment of punitive damages in such cases do not violate appellant's Equal Protection rights.

Moreover, as discussed above, the defendant's wealth is quite relevant to determine how much it should pay now in order to punish the defendant and to deter it from committing future wrongful acts. If these legitimate purposes of punitive damages are to be realized, this evidence should be allowed for this limited purpose. We also note that the defendants are not being punished in this case for being wealthy, they are being punished for maliciously causing a prosecution against Lieck. Appellants' twenty-ninth point is overruled.

Appellants' final point of error presents the argument that assessing multiple punitive damage awards against a single defendant for the same act violates due process.

No evidence in the record shows that another punitive damage award arising from the same facts has been assessed against BFI. Therefore, no error has been preserved. *See Celotex Corp. v. Tate,* 797 S.W.2d 197, 208–09 (Tex.App.—Corpus Christi 1990, no writ) (Benavides, concurring). Appellants' thirtieth point of error is overruled.

In accordance with our ruling on point of error nineteen, we must either offer a remittitur or reform the trial court's judgment with respect to Kenneth Lieck. We believe the proper course is to render the judgment the trial court should have rendered. *See* Tex.R.App.P. 80(c); *see also Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990) (rendering the judgment for attorney's fees because the evidence was undisputed); *Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex.1967) ("Normally, when the trial court has entered judgment notwithstanding the verdict, and an appellate court concludes that this was error, it must reverse the judgment of the trial court and enter judgment in harmony with the verdict ..."). In this case, the trial court should have awarded 70% of the punitive damage award to Kenneth Lieck and 30% of this sum to Nydia Lieck. Consequently, we reform the judgment by reducing Kenneth Lieck's punitive damage award by 30%, or $450,000. We otherwise affirm that portion of the judgment with respect to his claims.

By four points of error, Nydia Hinojosa Lieck brings a cross-appeal claiming error in the trial court's entry of judgment non obstante veredicto in favor of B.F.I. Industries and James Meszaros, cross-appellees, on her claim for loss of consortium. We reverse this portion of the judgment.

Nydia Lieck filed suit for loss of consortium for losses she suffered arising from the malicious prosecution of her husband, Kenneth Lieck. As discussed above, based on information appellees provided to the authorities, Kenneth Lieck was arrested on February 5, 1987, and charged with Official Misconduct. His indictment was quashed on March 30, 1987. The grand jury no-billed Lieck on April 8, 1987. He filed suit for malicious prosecution on February 24, 1988. Nydia Lieck filed suit alleging loss of consortium on April 4, 1989, more than two years after the indictment was quashed and less than two years after he was no-billed.

BFI pleaded limitations as a defense against Nydia Lieck's claim for loss of con-

sortium. BFI did not submit any questions on its limitations defense.

The jury found for the Liecks. It found $1.5 million in punitive damages against BFI. Thirty percent of the punitive damage award was assessed to Nydia Lieck. The jury also found that Nydia Lieck suffered $250,000 in actual damages for loss of consortium. The trial court granted judgment non obstante veredicto for cross appellees against Nydia Lieck. The basis of the court's ruling was not stated in its order.

Nydia Lieck argues in her four points of error that the trial court erred in granting judgment non obstante veredicto. Her first and second points claim that judgment non obstante veredicto was improperly granted on limitations grounds. In her third point she complains that laches could not be a basis for the trial court's ruling. By her fourth point she argues that the law provides recovery for loss of consortium arising from a malicious prosecution claim.

Appellees argue that the trial court's judgment was correct because the law does not provide recovery for loss of consortium arising from a malicious prosecution, thus Nydia Lieck cannot receive any recovery from her alleged injury. They also argue that if a claim for loss of consortium exists, the one year limitations statute applies, and therefore her action is time barred. Appellees further argue that if the two-year limitations period applies, the cause of action accrued, as a matter of law, more than two years before suit was filed, and therefore is also time barred.

■■■■ We first address point four which raises the question whether a claim for loss of consortium may be stated for injuries caused by the malicious prosecution of one's spouse. A cause of action for loss of consortium may accrue if there is negligent or *intentional* interference with the affection, solace, comfort, companionship, society, assistance, and sexual rela-

tions involved in the marriage relationship. *Whittlesey v. Miller*, 572 S.W.2d 665, 666 (Tex.1978). Malicious prosecution is an intentional tort. We therefore hold that a cause of action for loss of consortium may accrue from the malicious prosecution of one's spouse. Point four is sustained.

■■■■ Points one and two argue that the trial court erred in granting the motion for judgment non obstante veredicto on limitations grounds. The first issue we address is whether the two year statute of limitations applies for a cause of action for loss of consortium. This is a question of first impression.

As an initial matter, we note that several limitations statutes could apply including TEX.CIV.PRAC. & REM.CODE ANN. § 16.051 (Vernon 1992), the residual limitations statute, § 16.002, the one-year statute, and § 16.003, the two-year statute. Regardless of the parties' arguments, we must apply the correct statute of limitations because this is a question of law for the court. *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex.1990); *Refugio Lumber Co. v. Bailey*, 172 S.W.2d 133, 134 (Tex.Civ.App.—San Antonio 1943, writ ref'd).

We are guided by several decisions from the Supreme Court of Texas, including *Williams*, *Willis v. Maverick*, 760 S.W.2d 642 (Tex.1988), and *First National Bank v. Levine*, 721 S.W.2d 287 (Tex.1986). These cases demonstrate that the proper method for determining which statute of limitations applies is to identify the "common law term for a cause of action of those enumerated in the statutes of limitation that is most analogous to the modern counterpart." *Williams*, 802 S.W.2d at 654.[8]

For example, in *Williams*, the court reviewed the common law development of the cause of action for fraud and concluded that it was an action for a "debt." *See* § 16.004(a)(3). The *Levine* Court reviewed the development of the term "trespass" found in § 16.003(a) and decided that this

---

**8.** The reason why this method of analysis must be adopted in Texas is because in several cases the statutes of limitations segregate causes of action by their common law precursors rather than by identification of the cause of action by

name. *Compare* § 16.002 (A person must bring suit for malicious prosecution, libel, slander ... within one year ...) with § 16.003 (A person must bring suit for trespass for injury ... within two years ...).

term includes: "any act violative of the right of another through which injury is done to his estate or property." *Id.* at 289 (citing *Bear Bros. & Hirsch v. Marx & Kempner,* 63 Tex. 298 (1885)). The court noted that "trespass" includes what we now know as torts. Without discussion, the Court in *Willis* recognized that a cause of action for legal malpractice is "in the nature of a tort and is thus governed by the two-year limitations statute." *Willis,* 760 S.W.2d at 644 (citing *Levine* ).

■ Loss of consortium is a tort. In *Williams* the Court wrote that: "a tort not expressly covered by a limitation provision would presumptively be a "trespass" for limitations purposes." We therefore conclude that a cause of action for loss of consortium is governed by § 16.003, the two-year limitations statute which applies to a "trespass."

■ We disagree with appellants' argument that a claim for loss of consortium is governed by the same limitations period as the underlying tort. Although the action is derivative in the sense that it may not accrue without a separate tort, loss of consortium is an independent cause of action. *Whittlesey,* 572 S.W.2d at 667. Accordingly, it is governed by its own limitations period. We also note that the cause of action for loss of consortium is not an equitable action, thus it could not fall within § 16.051, the residual limitations statute. *Williams,* 802 S.W.2d at 658.

■ The next question we must address is when the cause of action for loss of consortium accrued. Appellants argue that the cause of action accrued at the time Kenneth Lieck was arrested. We disagree.

■ A cause of action under the legal injury rule accrues at the first point from which a party may seek a judicial remedy. *Houston Water Works v. Kennedy,* 70 Tex. 233, 8 .S.W. 36 (1888). This is the point at which the tort complained of is completed; *i.e.* when facts supporting each element of the cause of action come into existence. *See Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967) (cause of action for negligence accrued at the time damages were first suffered). At this point a legal injury occurs.

■ A cause of action for loss of consortium accrues at the time of the first *wrongful* interference with any of the interests protected by the this tort. *See Turner v. Turner,* 385 S.W.2d 230, 238 (Tex. 1964). These interests include affection, solace, comfort, companionship, society, assistance, and sexual relations. *Whittlesey,* 572 S.W.2d at 666. However, Nydia Lieck could not sue for loss of consortium until the derivative tort was completed, and she had suffered some injury.[9] Her losses prior to that date were not yet wrongful, and she could not have brought suit for these injuries before such time.

The issue we must address is when did the underlying tort accrue. As discussed in Kenneth Lieck's portion of this opinion, the elements of a cause of action for malicious prosecution are: 1) the commencement of a criminal prosecution against the plaintiff; 2) which has been caused by the defendant or through the defendant's aid or cooperation; 3) which terminated in the plaintiff's favor; 4) that the plaintiff was innocent; 5) that there was no probable cause for the proceedings; 6) that it was done with malice; and 7) that it damaged the plaintiff. In this case, the last element of this cause of action to come into existence was termination of the proceedings in the plaintiff's favor.

Lieck's indictment was quashed on March 30, 1987, because of problems in the makeup of the grand jury. He was no-billed by a different grand jury on April 8, 1987. The accruing event is potentially dispositive because March 30, 1987, is more than two years before Nydia Lieck's suit was filed, and April 8, 1987, is less than two years before suit was filed.

The question we must decide is whether the indictments *or* the subsequent refusal

---

9. This follows from the fact that a plaintiff in a loss of consortium action cannot sue unless the underlying tort is proven. No claim for loss of consortium could lie for an injury to a spouse which was not actionable.

to reindict is the point at which the proceedings were favorably terminated. We hold the latter.

In *Sullivan v. O'Brien*, 85 S.W.2d 1106 (Tex.Civ.App.—San Antonio 1935, writ ref'd), the court wrote:

> For it seems well settled that the termination contemplated does not mean the end of the purpose or intention to prosecute, or a final adjudication of the accused person's guilt or innocence, but means rather, the termination of the particular prosecution, or proceeding, complained of, so that, if the prosecutor intends to proceed further in his purpose, he must institute proceedings de novo, or, as sometimes said, is "put to a new proceeding."

*Id.* at 1115.

■ We believe the appropriate rule is that where multiple indictments are sought for the same act, the cause of action for malicious prosecution is finally and favorably terminated when the last indictment is dismissed or the defendant is no-billed for the last time. *See Equitable Life Assurance Soc. v. Lester*, 110 S.W. 499, 501 (Tex.Civ.App.1908, no writ) (grand jury's refusal to indict is legal termination of proceedings). The filing of a malicious prosecution claim at any time before such date would be premature.

■ As a matter of law, Kenneth Lieck's cause of action for malicious prosecution accrued at the time he was no-billed on April 8, 1987. This was the final and favorable termination on the merits for the purposes of malicious prosecution law. We consequently hold that Nydia Lieck's cause of action accrued on this date, and therefore is not barred by the two year statute of limitations. The trial court erred in granting judgment non obstante veredicto on limitations grounds. Cross-appellant's first and second points of error are sustained.

■ Cross appellant's fourth point argues that the trial court's ruling could not be sustained on the basis that the claim was barred by laches. We agree.

Cross appellees did not plead laches, and they requested no jury findings on that issue. Thus, they may only prevail if the issue was tried by consent and the evidence conclusively proves laches barred the action.

■ The two essential elements of the equitable defense of laches are 1) an unreasonable delay by one having legal or equitable rights in asserting them and 2) a good faith change of position by another to his or her detriment because of the delay. *Rogers v. Ricane Enter.*, 772 S.W.2d 76, 80 (Tex.1989). As a general rule, however, laches will not bar an action filed within the limitations period unless the evidence shows extraordinary circumstances rendering enforcement of the plaintiffs' rights inequitable. *Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834 (Tex.1968); *Wakefield v. Bevly*, 704 S.W.2d 339, 345 (Tex.App. 1985).

The evidence does not establish any good faith change of position by cross appellee. Moreover, we have found no extraordinary circumstances which would render enforcement of cross appellant's rights inequitable. Accordingly, we sustain cross appellee's third point of error.

We MODIFY the trial court's judgment in favor of Kenneth Lieck by reducing his punitive damage award by 30% or $450,000 to $1.05 million, and otherwise AFFIRM the judgment as it concerns Kenneth Lieck. The trial court's judgment barring Nydia Lieck's claim for loss of consortium is REVERSED and judgment RENDERED in accordance with the jury's finding of $250,000 in actual damages, plus prejudgment interest of $41,667, her 30% share of the 1.5 million in punitive damages ($450,000) awarded to both her and Kenneth Lieck, and postjudgment interest.

Concurring opinion by NYE, C.J., joined by Assigned JACKSON B. SMITH, Jr., J.

Concurring opinion by FEDERICO G. HINOJOSA, Jr., J.

Dissenting opinion by SEERDEN, J., joined by KENNEDY and DORSEY, JJ.

Before the Court En Banc.[1]

FEDERICO G. HINOJOSA, Jr., Justice, concurring.

I concur with Justice Gilberto Hinojosa's opinion and adopt his analysis of the facts of this case. I write separately to distinguish my vote in this case from that in *Browning–Ferris Industries, Inc. v. Zavaleta*, 827 S.W.2d 336 (Tex.App.—Corpus Christi 1991, writ denied), and to show how the differences in these two cases have led the majority of this Court to affirm the trial court's judgment in favor of Kenneth J. Lieck.

In reviewing Texas case law on malicious prosecution, I find that the Courts of Appeals have thoroughly confused the issues of causation and proximate causation with the element of probable cause. *See, e.g., Compton v. Calabria*, 811 S.W.2d 945, 950–51 (Tex.App.—Dallas 1991, no writ). In particular, the Courts have mistaken a proximate causation issue to be a probable cause issue.

As in any tort, a malicious prosecution plaintiff must prove that the defendant's act or omission caused an injury. When criminal proceedings are instituted against the plaintiff based on an allegation made by the defendant, then the defendant caused the institution of criminal proceedings. RESTATEMENT (SECOND) OF TORTS § 653 comment d (1977).[2] If a court determines that the defendant's act caused the plaintiff's injury, the court must then determine whether the act and the injury have a relationship to which the law attaches liability.[3] That is, the court inquires whether the act proximately caused the plaintiff's injury.

To show proximate causation, the plaintiff must prove that there are no intervening circumstances that insulate the defendant from liability as a matter of law. In a malicious prosecution case, a public prosecutor who is fully informed of the material facts and who exercises independent discretion in deciding to file criminal charges is such an intervening circumstance. RESTATEMENT (SECOND) OF TORTS § 653 comment d (1977). A defendant shows lack of proximate causation when he shows that he fully informed the prosecutor of material facts within his knowledge and the prosecutor used independent discretion in filing criminal charges. *Fisher v. Beach*, 671 S.W.2d 63, 66 (Tex.App.—Dallas 1984, no writ); *Thomas v. Cisneros*, 596 S.W.2d 313, 317 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.); *Green v. Meadows*, 517 S.W.2d 799, 808 (Tex.Civ.App.—Houston [1st Dist.] 1974), *rev'd on other grounds*, 524 S.W.2d 509 (Tex.), *on remand*, 527 S.W.2d 496 (1975); *Ada Oil Co. v. Dillaberry*, 440 S.W.2d 902, 912 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ dism'd); *Andrews v. Dewberry*, 242 S.W.2d 685, 688 (Tex.Civ. App.—Fort Worth 1951, writ ref'd n.r.e.).

Appellants argue that they are not liable for malicious prosecution unless they knowingly made a false statement to the prosecutors. In *Thomas*, the Austin Court of Appeals noted that RESTATEMENT (SECOND) OF TORTS § 653 comment g (1977) states that when a private prosecutor gives a public official information of another's supposed criminal conduct, the private prosecutor is immune from liability unless it appears either 1) that his desire to have the proceedings initiated was the determining factor in the official's decision to commence the prosecution or 2) that the private prosecutor knew that the information he furnished was false. However, this comment does not express the law in Texas; it is only "[t]he reasoning behind" the Texas rule of "full and fair disclosure." *Thomas*,

---

1. Honorable Jackson B. Smith, Jr., Retired Justice, First Court of Appeals, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex.R.App.P. 79(d).

2. The Restatement is cited with the obvious caveat that it is a general reference work, useful for discussing basic principles of torts, but does not necessarily represent the particulars of Texas law.

3. Normally an intentional tort does not require proof of proximate causation, there being no recognized intervening circumstances to prevent liability from attaching to assault, battery, trespass, etc. Since malicious prosecution is not favored at law, proximate causation issues exist.

596 S.W.2d at 317. The Austin Court also noted that a defendant is required to state to the prosecutor the objective facts as the defendant knew them. *Id.* Proximate cause may be established if the private prosecutor fails to disclose all pertinent facts or falsely represents the facts. *Fisher*, 671 S.W.2d at 66. The private prosecutor must bring to the attention of the public prosecutor all material facts from which the district attorney might determine that the accused is not guilty of any offense. *Eans v. Grocer Supply Co.*, 580 S.W.2d 17, 22 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ).

Appellants cite *Thomas* and *Green* as support for their contention that they may not be held liable for causing Lieck's indictment unless they made a knowing false statement. Neither case addresses the question appellants raise. As noted above, the Austin Court of Appeals quoted RESTATEMENT (SECOND) OF TORTS § 653 comment g in *Thomas*, but it then held that full and fair disclosure was required and met by that defendant. *Thomas*, 596 S.W.2d at 317. In *Green*, the Houston First Court of Appeals quoted comment g, but found that the defendant in that case had furnished false information to the prosecutor. *Green*, 517 S.W.2d at 809. Hence, the Court in *Green* could not, and did not, reach the question whether it was necessary for the malicious prosecution plaintiff to prove that the defendant uttered a knowing false statement to the public prosecutor. I have not found a single Texas case in which a defendant who failed to fully and fairly disclose material facts to the prosecutor was held immune from liability on the ground that he did not make a knowing false statement.

"Probable cause" is a specific element of the tortious conduct of malicious prosecution. It has nothing to do with questions of causation or proximate causation of injury. RESTATEMENT (SECOND) OF TORTS § 662 (1977) states that:

> One who initiates or continues criminal proceedings against another has probable cause for doing so if he correctly or reasonably believes
>
> (a) that the person whom he accuses has acted or failed to act in a particular manner, and
>
> (b) that those acts or omissions constitute the offense that he charges against the accused, and
>
> (c) that he is sufficiently informed as to the law and the facts to justify him in initiating or continuing the prosecution.

This is a very tough standard for a defendant to meet. He must show that he reasonably believed that the plaintiff committed an act or omission, that the act or omission constituted a crime, and that he was sufficiently informed of the law and facts to justify prosecution. According to the Restatement, this standard also applies to a private person who merely procures the institution of criminal proceedings, that is, a private person who provides information to a public official who exercises discretion in bringing charges. RESTATEMENT (SECOND) OF TORTS § 662 comment a (1977).[4]

Public policy favors cooperation between citizens and law enforcement authorities in order to encourage the exposure of crime. *Thomas*, 596 S.W.2d at 317. To this end, the burden is on the malicious prosecution plaintiff to show lack of probable cause, and courts of this State initially presume that the defendant acted reasonably and in good faith, thereby establishing probable cause. *Akin v. Dahl*, 661 S.W.2d 917, 920 (Tex.1983).

Under the reasoning of this Court's decision in *Zavaleta*, the trial court erred by charging the jury that probable cause

---

4. Applying this standard to a cooperation case appears fraught with difficulty. For example, a person approaches a prosecutor and advises him of a fact situation that the person is uncertain constitutes a crime. The prosecutor investigates the facts and determines that a crime has been committed, based on the revealed facts. The citizen cannot be said to have any belief that the plaintiff's acts constituted an offense.

In a cooperation case, however, a defendant is only said to have procured the initiation of criminal proceedings when his desire to initiate them becomes the official's deciding factor or when he fails to fully and fairly disclose information to the official. *Thomas*, 596 S.W.2d at 317. Failure to fully and fairly disclose material facts implies belief that the plaintiff committed no offense.

"means the existence of such facts and circumstances as would cause belief in a *reasonable* mind, acting on the facts within the knowledge of Mr. Meszaros, that Mr. Lieck was guilty of the conduct for which he was prosecuted." Since the prosecutor investigated the case against Lieck and determined that it should be presented to the grand jury, the "probable cause" question should inquire into Meszaros's actual beliefs, not into whether he held reasonable beliefs. We require a higher level of mental culpability from a defendant in a cooperation case, compared with a defendant in an initiation case, to comport with the social policy of encouraging cooperation with law enforcement authorities.

RESTATEMENT (SECOND) OF TORTS § 662 comment c (1977) states that the defendant must actually believe in the guilt of the plaintiff, or probable cause is not established. If the defendant actually believes that the accused is guilty, then the plaintiff must show that the facts known or reasonably believed by the defendant are not sufficient to create a belief of plaintiff's guilt in a reasonable mind. *Fisher*, 671 S.W.2d at 66; RESTATEMENT (SECOND) OF TORTS § 662 comment e (1977). In a cooperation or procurement case, the question of actual belief of guilt might be immediately resolved against the defendant based on the reasoning that the defendant had no belief of plaintiff's guilt.[5] In such a case, the defendant would not have recourse to the further defense that a reasonable mind would have believed the plaintiff guilty of an offense.

Since law enforcement authorities need citizens to cooperate and expose criminal conduct, some safeguard must be maintained for citizens who bring allegations of fact, but not allegations of a crime. The proximate cause issue provides one such safeguard. The intervening act of the fully informed prosecutor will insulate a citizen who fully and fairly discloses all material facts from liability. In addition, Texas law requires a malicious prosecution plaintiff to prove his case by clear and convincing evidence. *Diamond Shamrock Corp.*

*v. Ortiz*, 753 S.W.2d 238, 241 (Tex.App.— Corpus Christi 1988, writ denied).

The probable cause issue will also protect a citizen who cooperates with law enforcement authorities, if the question is slightly altered. It makes little sense to ask a jury whether a citizen who alleged facts, but was uncertain that a crime had been committed, had an actual belief that the plaintiff was guilty of the offense of which he was later charged. In a cooperation or procurement case, honest citizens who report suspicious behavior would be better protected if the jury was asked whether the citizen had an actual belief of the *innocence* of the accused. If the jury can answer this question affirmatively, then the citizen did not have probable cause to procure the instigation of criminal proceedings. Such an inquiry can be resolved against a defendant who knows the plaintiff's innocence but cooperates with prosecutors, while being resolved in favor of a defendant who is uncertain whether the plaintiff is guilty of anything. Texas Courts have adopted this inquiry. *See Ada Oil Co.*, 440 S.W.2d at 910; *J.C. Penney Co. v. Gilford*, 422 S.W.2d 25, 30 (Tex.Civ. App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). Under this analysis, a defendant who procures the initiation of criminal proceedings does so without probable cause if he believes the plaintiff to be innocent of wrongdoing or if he does not believe the plaintiff acted or failed to act in the particular manner that the defendant accuses.

A plaintiff can establish a malicious prosecution action by proving that the defendant procured the initiation of criminal proceedings. To do so, he must show that the defendant made a factual allegation that became the basis of criminal charges. He must show proximate causation by demonstrating that the defendant did not fully and fairly disclose all material facts to the prosecutor. He must show lack of probable cause for the proceedings by proving that the defendant either knew of the plaintiff's innocence or that the defendant knew the falsity of the factual allegation.

5. See n. 3, supra.

A plaintiff who proves 1) that a defendant made a false material factual allegation that led to the institution of criminal proceedings against the plaintiff, which were terminated in his favor, and 2) that the defendant made the allegation knowing it to be false, has proven both proximate cause and lack of probable cause. However, a false material factual allegation is not necessary to maintain an action for malicious prosecution. A defendant who has an actual belief that the plaintiff is innocent of criminal wrongdoing, who makes statements that give rise to criminal charges against the plaintiff, and who hides material facts which would exonerate the plaintiff is liable for malicious prosecution. This is Meszaros' situation.

I have previously stated in this concurring opinion that public policy disfavors malicious prosecution actions so as not to discourage citizens from cooperating with law enforcement agencies in exposing crime. This policy should not be applied without giving weight to the countervailing policy of discouraging the abuse of the criminal justice system. Courts of this State should not approve of citizens who spin tales suggesting criminal conduct by revealing only part of the truth, all the while knowing the party being condemned is innocent of all wrongdoing. These citizens encumber an already overburdened body of prosecutors, requiring them to waste time and money investigating innocent people for no good reason. In addition, innocent citizens may be subjected to the extraordinary intrusion of a grand jury investigation, which may culminate in an indictment. By then, even the dismissal of charges might not preclude the destruction of career, reputation, opportunity, and family harmony. This is Lieck's situation.

This Court found the trial court erred in *Zavaleta* by failing to instruct the jury that "probable cause" depended on Meszaros' actual, rather than reasonable, beliefs. This Court found the evidence in *Zavaleta* factually insufficient to support a finding

of malicious prosecution. We accordingly reversed and remanded the case to the trial court. I joined the majority opinion, finding the instruction erroneous for failing to inquire into Meszaros' actual beliefs. The facts of *Zavaleta* show that error was harmful.

Dr. Zavaleta was indicted for soliciting a bribe. The following statement, which possibly caused the indictment to issue, was made by Meszaros:

In fact, Commissioner Tony Zavaleta introduced me to two gentlemen from a bank in Brownsville that had just opened, stating that we, BFI, was [sic] going to have the garbage contract in Brownsville. This bank was a branch of a bank in Laredo, Texas. Mr. Zavaleta asked if we could put our Brownsville account with this bank, of which I said I thought it would not be a problem, but I would have to check it with the people who make those decisions.

Dr. Zavaleta and three other people who were alleged to have taken part in the conversation, all testified at trial that the gentlemen were introduced and that Dr. Zavaleta merely suggested they become acquainted. The witnesses testified in a conflicting manner concerning the actual words exchanged in this conversation. A jury could have found that Meszaros had an actual, albeit unreasonable, belief that he was solicited for the bank account. While Meszaros admitted that he did not feel compelled to deposit BFI's account into the bank in question, that statement did not show either that he had an actual belief that Dr. Zavaleta was innocent or that he believed the conversation was different from what he told the investigators.[6] Our review of the evidence and pleadings indicated that the charge error was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

In the present case, however, there is no question that Meszaros and Freed, BFI employees, made misleading statements to the

---

**6.** "Solicit" is not defined in Tex.Penal Code Ann. § 36.02 (Vernon Supp.1992). "Solicitation of bribe" has been defined as "asking, or enticing, or requesting of another to commit crime of bribery." Black's Law Dictionary 1249 (5th ed. 1979). Only in the context of soliciting a crime is "soliciting" equated with "compelling" or "commanding." *Id.*

prosecutors and investigators. As this Court has stated, "full and fair disclosure" requires disclosing all material facts. *Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex. App.—Corpus Christi 1988, writ denied). As Justice Gilberto Hinojosa shows, Meszaros knew and failed to disclose: 1) the City of Brownsville was not soliciting sealed bids for the garbage contract, 2) the proposals were open to the public and to competing contractors, 3) he had equal access to BFI's competitor's proposals, 4) BFI distributed the form contract throughout the Rio Grande Valley, 5) the numbers and figures in the contract were items negotiated with the city, 6) BFI had no claim to any negotiated figure, and 7) Lieck committed *no offenses.* These facts show that the information Lieck gave to Torres was available to the public and was neither confidential nor advantageous to BFI's competitors.

The misleading statements that Meszaros made to investigators and which were presented to the grand jury were not supported by any actual belief of full disclosure. Meszaros admitted knowing of Lieck's innocence and facts that, if disclosed to prosecutors, would have prevented the prosecutors from seeking Lieck's indictment.

I find the evidence both legally and factually sufficient to support the jury finding that Meszaros, acting without probable cause and with malice, caused, aided, or cooperated in causing a criminal prosecution of Lieck. I find error in the trial court's failure to charge the jury with an inquiry into Meszaros' actual belief. However, I find the error harmless, given Meszaros' admissions on the witness stand. I agree that the trial court's judgment in favor of Kenneth J. Lieck should be modified and affirmed.

I also agree that the trial court's judgment barring Nydia Hinojosa Lieck's claim for loss of consortium should be reversed and judgment rendered in accordance with the jury's findings.

Before the Court En Banc.[1]

NYE, Chief Justice, concurring.

I write separately to concur. I agree with the holding of the majority that the evidence is legally and factually sufficient to support the jury's finding that Meszaros, acting without probable cause and with malice, caused, aided, or cooperated in causing the prosecution of Lieck. I also agree that the judgment barring Nydia Lieck's claim for loss of consortium should be reversed and rendered. I further agree with the majority's determination that the exemplary damage award should be upheld with the suggested modification.

In *Browning–Ferris Industries v. Zavaleta,*[2] I stated in my dissenting opinion that unless a party acting in good faith discloses to the prosecuting attorney *all* material facts that are made known to him, probable cause does not exist. Here, as in *Zavaleta* the defendant failed to disclose to the authorities several facts discussed by the majority, which would have convinced the prosecutors not to indict Lieck.

Because I do not agree with the precise reasoning under some of the points of error, I choose to concur rather than join the majority without reservation. Therefore, I concur.

Assigned JACKSON B. SMITH, Jr., J., joins in this concurring opinion.

Before the Court En Banc.[1]

SEERDEN, Justice, dissenting.

I respectfully dissent. The central question to be decided in this case is whether the information furnished by appellants to the investigators on December 17, 1986 and later supplemented at the State's request, maliciously caused or contributed to the

---

1. Honorable Jackson B. Smith, Jr., Retired Justice, 1st Court of Appeals, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex.R.App.P. 79(d).

2. 827 S.W.2d 336 (Tex.App.—Corpus Christi 1992, writ denied)

---

1. Honorable Jackson B. Smith, Jr., Retired Justice, First Court of Appeals, assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex.R.App.P. 79(d).

indictment of Kenneth Lieck. I would hold that it did not.

It is undisputed that the Texas Rangers and the Cameron County District Attorney's Office were investigating the Brownsville officials prior to the December 17th meeting. It is also undisputed that the December 17th meeting was initiated at the request of appellants to furnish information regarding the privatization of the Brownsville waste system. There is also no question that this privatization was a long process that unexpectedly did not turn out in appellants' favor.

The only reference to Lieck in Meszaros' statement of December 17th is reflected in the second page, where it is stated:

I would like also to mention that while we were negotiating the contract with the City of Brownsville, we worked long hours on the proposals because of the request from the city manager, Kenneth Leick [sic] to meet various deadlines. The contract of B.F.I. was solely to be used by the City of Brownsville for their own use in reaching an agreement on the contract between B.F.I. and the City of Brownsville and nobody else.

The indictment of Lieck charged:

on or about April 7, 1986 ... [Lieck] ... unlawfully and knowingly distributed to Robert Torres confidential information in the custody of the City Commission of the City of Brownsville which, if released, would give advantage to competitors and bidders, said information being the content of a Contractor's Proposal for Solid Waste Collection and Disposal submitted to the City of Brownsville by Browning–Ferris Industries.

Appellees base their claim against appellants on Meszaros' statement that their proposals were to be used solely by the city in reaching an agreement with B.F.I. and no one else. What appellees did not establish, and what the majority fails to recognize, is that there is no evidence appellants were accusing Lieck of a crime by this statement. The majority concedes that it is not clear which penal statute was violated. Every act of official misconduct, if any, is not necessarily a crime. Appellees never

proved which criminal statute appellants accused Lieck of violating. The majority concedes it cannot tell what law appellants accused appellee of violating. At trial, Meszaros' testimony was to the effect that he did not believe Lieck had committed a crime.

Mosbacker testified that he alone reached the legal opinion that Lieck had violated the law, that he decided to seek the indictment, and that the information that B.F.I. had disseminated the form of the contract did not change his opinion that there was probable cause that the law had been violated. Many people gave information during the investigation. No one pressured him to seek Lieck's indictment. He had the minutes of the city meetings, statements of commissioners Lackner and McNair, and information from Hodge, Hodge's secretary, and Torres. It is their statements that give the facts upon which the indictment is based. McNair's affidavit states in part:

All during the negotiations, I felt that B.F.I.'s proposals were being given to the representatives of G.M.S. I thought this because when we started the process of receiving the proposals, B.F.I.'s and G.M.S.'s were like night and day—what each company was offering was quite different. But as the process continued, G.M.S.'s proposals were getting more and more similar to those of B.F.I.'s. It seemed to me that every time the City Manager, Ken Lieck, passed out the proposals, a copy of B.F.I.'s ended up in the hands of G.M.S.'s people.

And since Ken was the only person dealing with the garbage companies and the only person passing the proposals on to the City Commission, I became suspicious. I believed that if proposals were being unfairly exchanged during the negotiations, the City was not going to receive the best deal because the true process of bettering the competition by adding your own company's trade secrets (rates, disposal fee, free services, insurances, type of equipment, purchase price, etc.) would not be kept confidential. Since I was new in politics (elected

in November 1985), I did not know that it was illegal to exchange proposals, but I did know that if you wanted to get the best deal, and do what was best for Brownsville, you don't hand the competition the proposals of the other companies which are also making proposals. And Ken had told me that proposals were not public information until the actual contract was awarded.

Lackner's affidavit recounting each stage of the proposal process states at each stage that all information was to remain confidential and not public until accepted. Mosbacker said he presented the matter to the grand jury and recommended the return of the true bill.

District Attorney Ben Euresti testified that Mosbacker was responsible for presenting cases, including this one, to the grand jury. The decision on whether the substance of the allegations was sufficient to present to the grand jury was between the Rangers and Mosbacker. Neither Meszaros nor other B.F.I. employees would be involved in that decision. After an investigation, the district attorney's office had the duty to decide whether to seek an indictment. The district attorney's office did not rely on B.F.I. or on others to tell it when the law was transgressed.

In a case of malicious prosecution, a plaintiff must prove that the defendant knowingly provided false information, or that he did not actually believe what he told authorities. See *Coniglio v. Snyder*, 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied). The Restatement (Second) of Torts § 653, comment (g) (1977), quoted favorably in *Thomas v. Cisneros*, 596 S.W.2d 313, 317 (Tex.Civ. App.—Austin 1980, writ ref'd n.r.e.) states in relevant part:

In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by

direction, request or pressure of any kind, was the *determining factor* in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was *known to be false.* (Emphasis added).

Even under the definition of "probable cause" submitted to the jury with Question 1, there was no evidence to show that B.F.I. and Meszaros wanted to have Lieck indicted. I would hold there is no evidence that appellants caused or contributed to the cause of the indictment.

By points twelve through fifteen, appellants complain of the definition of "probable cause" in Question 1 and of the trial court's failure to properly instruct the jury about "full and fair disclosure" on appellants' part. The trial court refused appellants' requested definition, "[p]robable cause is such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of Mervyn Mosbacker, that Kenneth Lieck was guilty of the misdemeanor for which he was indicted." It also refused to submit, "You are hereby instructed that a person cooperating or aiding in an investigation does so upon probable cause if that person, in good faith, makes a full and fair statement of the facts to the investigator, and the prosecuting attorney thereafter commences the criminal proceeding."

The definition of "probable cause" the trial court submitted is essentially the same as that used in *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex.1983) and *Ramsey v. Arrott*, 64 Tex. 320, 323 (1885). Appellants suggest that we distinguish the *Akin* line of cases because in those cases the parties being sued actually brought the formal complaint, while in this case, appellants did not formally bring a complaint, but furnished information to law enforcement officers, who acted independently and used their own discretion in bringing formal charges.[2] They further argue that in this

2. We distinguish *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988), factually and legally. The majority claims *Davis* authorizes the jury charge language "caused, aided, or contributed to the criminal prosecution" as the cor-

rect standard; however, in *Davis*, the causation standard given the jury was not at issue. Moreover, the facts in the opinion do not show that any person or entity other than the City (by and through its parks director) initiated any investi-

situation, the probable cause standard should be different. They contend that when one actually brings a criminal charge, the test of "belief in a reasonable mind, acting on facts within his knowledge, that the person is guilty of the criminal conduct for which he is charged" is appropriate, but that the principles in *Thomas* govern this case.

In *Thomas*, 596 S.W.2d at 315, Cisneros was a State Board of Insurance employee and coincidentally, a member of the Travis County Grand Jury. A fellow employee, Thomas,[3] said in conversing about Cisneros' grand jury service, "Well, I hope you are not after the chairman, you might not be here the next day." The comment referred to an investigation of a particular insurance company and its regulation by the Board of Insurance. Cisneros told the grand jury foreman about the remark. Later, the District Attorney asked Cisneros about it. Although Cisneros refused to sign a complaint, Thomas was charged with "retaliation." After the charge was dismissed, Thomas sued Cisneros for malicious prosecution.

In affirming the summary judgment for Cisneros, the Court stated:

Because we deem the element of causation to be determinative of this case, we will discuss only this issue. This element of malicious prosecution requires that the criminal prosecution can be caused by the defendant *or through the defendant's aid or cooperation* [citations omitted]. It is not necessary for

the defendant to have signed the complaint or to have communicated the subject matter to the person who did if the making of the statement proximately caused the prosecution that followed [citations omitted]. However, it is a corollary to this rule that ... *if the defendant stated the facts fully and fairly to the District Attorney ... and such officer determines that such facts constitute a crime and proceeds to formulate the necessary papers to set the prosecution in motion, the ... defendant is not liable in an action for malicious prosecution, since, if there is any fault, it is not the defendant's.* (emphasis added). *Thomas*, 596 S.W.2d at 316–17.

Thus, when a person charged with malicious prosecution directly brings the formal criminal complaint, a definition of "probable cause" like the one in this case would be proper. *See Akin*, 661 S.W.2d at 921. However, if the indictment is caused indirectly through the aid or cooperation of the person charged with malicious prosecution, that person is not liable if he has made a full and fair disclosure of the facts to the prosecuting authorities.[4] *See Thomas*, 596 S.W.2d at 317.

In discussing probable cause, this Court observed in *Coniglio*, 756 S.W.2d at 744:

A prosecuting party who files a criminal complaint does so upon probable cause where, in good faith, he makes a full and fair disclosure of the facts and circumstances known to him at the time. Unless a person fairly discloses informa-

gation or proceedings against Davis. *See Davis*, 752 S.W.2d at 522. *Davis* is not a case in which the City volunteered information in an ongoing investigation which encompassed employee Davis.

3. The majority (at 938) refers to Thomas as "the office jokester." My reading of the case does not indicate whether the comment was made in jest or whether Thomas made humorous remarks on other occasions.

4. Public policy requires citizens to feel free to furnish information about possible illegal activities to law enforcement authorities. *See Diamond Shamrock Corp. v. Ortiz*, 753 S.W.2d 238, 241 (Tex.App.—Corpus Christi 1988, writ denied). The testimony of Cantu, Euresti, and

Mosbacker illustrate the policy grounds for making it difficult to prosecute a witness for his testimony to a grand jury, and illustrate different approaches to the role of the grand jury.

Reynaldo Cantu, former Brownsville City Attorney, former District Attorney, and former special prosecutor, testified that it is malpractice for an attorney to allow his client to testify before a grand jury. He said this is because the client is questioned without his attorney and can be prosecuted for aggravated perjury if he misstates or forgets something. When asked if he ever asked a grand jury to indict someone without a thorough investigation, he replied that "the norm in these counties is that you don't have a particularly thorough investigation. You have enough to meet the elements of the offense, and then you proceed from there."

tion to a prosecuting attorney, in good faith, probable cause does not exist. Probable cause has been defined as a state of mind in which the facts are regarded from the point of view of the prosecuting party. The question is not what the actual facts were, but what he honestly believed them to be. [Cites omitted].

The definition of probable cause in this case erroneously required the jury to focus on what Meszaros *reasonably* believed rather than on what he *actually* believed, regardless of the truth.

In addition, the charge does not adequately address the principle of full and fair disclosure. Lieck had the burden to show that appellants failed to make a full and fair disclosure of the facts and circumstances known to them. *Coniglio,* 756 S.W.2d at 747; *Terk v. Deaton,* 555 S.W.2d 154, 155 (Tex.Civ.App.—El Paso 1977, no writ). The definition of probable cause submitted in this case does not include the element of full and fair disclosure. Rather, the explanation of probable cause asks only whether the facts and circumstances would cause belief in a *reasonable* mind that Lieck was guilty of the conduct for which he was prosecuted, whereas, if a full and fair disclosure was made, probable cause should exist if the facts and circumstances caused *actual* belief in the person reciting them.

Although the jury found in response to Question 2 that Meszaros failed to make a full and fair disclosure to the investigating officers, this did not amount to a finding that he knowingly provided false information, or that he did not actually believe what he told them.

In light of the facts before the jury, appellants' objections to the charge and requests for additional instructions, I would hold that the definition of probable cause was insufficient and erroneous. Under the correct law, no evidence supports the result. These errors caused the rendition of an improper judgment within the meaning of Tex.R.App.P. 81(b)(1). I would sustain points one, two, four, five, nine, and twelve through fifteen, reverse the trial court's judgment, and render judgment that appellees take nothing.

KENNEDY and DORSEY, JJ., join in this dissent.